# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                        No. CR 22-0890 JB

GLEN A. JACKSON, JR.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Motion to Suppress Evidence, filed June 22, 2022 (Doc. 20)("Suppression Motion"); and (ii) the Supplemental Motion to Suppress Evidence, filed September 8, 2022 (Doc. 38)("Supplemental Suppression Motion"). The Court held an evidentiary hearing on December 20, 2022. See Clerk's Minutes, filed December 20, 2022 (Doc. 57). The primary issues are: (i) whether Drug Enforcement Agency ("DEA") Special Agent Jarrell W. Perry's interaction with Defendant Glen A. Jackson, Jr., was a consensual encounter, or an illegal detention and seizure; (ii) whether (a) Jackson's self-search of his bags was a search for Fourth Amendment purposes, and (b) whether the self-search was the product of inducement, trickery, or deception during Perry's questioning; (iii) whether Perry had probable cause to arrest Jackson on the basis of Jackson's statements, behavior, and his black duffle bag's revealed contents; (iv) whether Perry had probable cause to seize Jackson's bags on the basis of Jackson's statements, behavior, and his black duffle bag's revealed contents; and (v) whether the DEA's warrantless, post-arrest search of Jackson's bags at the DEA office was permissible (a) under the plain-view exception to the warrant requirement, or (b) as an inventory search. The Court concludes: (i) Perry's interaction with Jackson was a consensual encounter; (ii) Jackson's self-

search was (a) not a search for Fourth Amendment purposes and (b) was not the product of inducement, trickery, or deception; (iii) Perry had probable cause to arrest Jackson, based on Jackson's statements, behavior, and his black duffle bag's revealed contents; (iv) Perry had probable cause to seize Jackson's bags, based on Jackson's statements, behavior, and his black duffle bag's revealed contents; and (v) the warrantless, post-arrest search of Jackson's bags at the DEA office was (a) impermissible under the plain-view exception to the warrant requirement, because it was not a foregone conclusion that the bags contained illegal narcotics, but (b) permissible as an inventory search, because it was conducted in good faith pursuant to an established DEA policy.  Accordingly, the Court denies the Suppression Motion and Supplemental Suppression Motion.

## **FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege.").

Thus, the Court may consider hearsay in ruling on a motion to suppress. Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements. See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished) ("[T]he Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).[1]

**1.      The April 29, 2022, Interdiction Operation.**

---

[1]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Lopez-Carillo, United States v. Sanchez, 720 F. App'x 964 (10th Cir. 2018), United States v. Alabi, 597 F. App'x 991 (10th Cir. 2015), United States v. Reed, 195 F. App'x 815 (10th Cir. 2006), United States v. Moraga, 76 F. App'x 223 (10th Cir. 2003), United States v. Cecala, 203 F.3d 836 (10th Cir. 2000), Molina v. Spanos, 208 F.3d 226 (10th Cir. 1999), and United States v. Battle, 188 F.3d 51 (10th Cir. 1999), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

1.     Perry is a Special Agent for the DEA assigned to the DEA's Albuquerque, New Mexico, office.  See Transcript of December 20, 2022, Hearing at 4:12-15 (Perry), filed January 24, 2023 (Doc. 58)("December 20 Tr.").

2.     On April 29, 2022, Perry conducted an interdiction operation at the Greyhound bus station in Albuquerque, New Mexico.  See December 20 Tr. at 6:17-7:2 (Cordova, Perry).

3.     Perry was wearing plain clothes and concealed his firearm, badge, and handcuffs. See December 20 Tr. at 7:12-8:13 (Cordova, Perry); id. at 59:8-60:6 (Meyers, Perry).

4.     DEA Task Force Officer Ray Zamarron accompanied Perry on the interdiction operation.  See December 20 Tr. at 8:23-25 (Cordova, Perry).

5.     Zamarron was wearing plain clothes, and did not have a firearm, badge, or handcuffs visible.  See December 20 Tr. at 9:8-21 (Cordova, Perry).

6.     Perry and Zamarron boarded an eastbound Greyhound bus.  See December 20 Tr. at 9:23-25 (Cordova, Perry).

7.     Perry stood at the bus' rear, waiting for passengers to reboard.  See December 20 Tr. at 10:3-7 (Cordova, Perry).

8.     Zamarron stood at the bus' front, behind the driver's seat, and not blocking the exit. See December 20 Tr. at 10:8-15 (Cordova, Perry).

9.     There were fifteen to twenty people on the bus.  See December 20 Tr. at 12:1-6 (Cordova, Perry); id. at 68:22-24 (Meyers, Perry).

**2.     Osorio's Self-Search and Arrest.**

10.     After questioning other passengers, Perry approached a passenger named Osorio, who was sitting on the bus' left side, showed him his badge, and asked him questions.  See December 20 Tr. at 62:17-22 (Meyers, Perry); id. at 67:12-19 (Meyers, Perry).

11.     When speaking to Osorio, Perry stood to the rear of Osorio's seat, partially in the aisle.  See December 20 Tr. at 67:5-11 (Meyers, Perry).

12.     Perry told Osorio that he was searching for "contraband."  December 20 Tr. at 70:14-17 (Meyers, Perry).

13.     Perry did not tell Osorio he could refuse consent to have his belongings searched.  See December 20 Tr. at 70:5-9 (Meyers, Perry).

14.     Osorio did not consent to Perry searching his bags.  See December 20 Tr. at 62:23-63:4 (Meyers, Perry).

15.     Perry asked Osorio to open his bag to show Perry its contents, which Osorio did.  See December 20 Tr. at 63:5-13 (Meyers, Perry).

16.     When Osorio opened his bag, Perry saw packaging and bundles in Osorio's bag.  See December 20 Tr. at 63:16-21 (Meyers, Perry).

17.     Perry arrested Osorio seconds after Osorio opened his bag, for possession with intent to distribute more than 500 grams of cocaine.  See December 20 Tr. at 60:10-17 (Meyers, Perry); id. at 63:16-23 (Meyers, Perry).

18.     Zamarron walked Osorio to the bus' front.  See December 20 Tr. at 64:7-15 (Meyers, Perry).

**3.     Jackson's Self-Search and Arrest.**

19.     Perry next approached Jackson, who was sitting across the aisle from where Osorio had been sitting and saw Osorio's questioning and arrest.  See December 20 Tr. at 11:6-13 (Cordova, Perry); id. at 60:10-21 (Meyers, Perry); id. at 67:5-19 (Meyers, Perry).

20.     Before Perry spoke to Jackson, Perry did not search or manipulate Jackson's bags.  See December 20 Tr. at 31:1-3 (Cordova, Perry); id. at 107:1-7 (Meyers, Perry).

21.     Displaying his DEA badge, Perry told Jackson: "I'm a police officer, and we check the bus here.  I'm sure you saw me.  May I speak to you for a moment?" a statement which referred to Perry's questioning and arresting Osorio, as well as questioning passengers, generally.  April 29, 2022 Transcript of Bus Encounter with Glen A. Jackson, Jr. at 2:2-4 (Perry), filed December 20, 2022 (Doc. 57-2 at 1-7)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 1A)("April 29 Tr.").[2]  See December 20 Tr. at 15:8-11 (Cordova, Perry); id. at 16:2-5 (Cordova, Perry).

22.     In response to Perry's request to speak with Jackson, Jackson said "yeah." December 20 Tr. at 15:17-16:1 (Cordova, Perry).

23.     When Perry spoke to Jackson, he stood just behind Jackson's seat, in the bus' aisle. See December 20 Tr. at 11:14-17 (Cordova, Perry); id. at 83:2-10 (Meyers, Perry); id. at 83:25-84:3 (Perry).

24.     When Perry spoke to Jackson, Zamarron remained at the bus' front, behind the driver's seat.  See December 20 Tr. at 11:21-25 (Cordova, Perry).

25.     Perry spoke to Jackson for roughly three-and-a-half minutes.  See December 20 Tr. at 12:7-10 (Cordova, Perry).

26.     Perry asked Jackson where he was traveling.  See April 29 Tr. at 2:11 (Perry).

---

[2]The Court has reviewed, in addition to the April 29 Tr., the Audio Recording of the April 29, 2022, Interdiction Operation, lodged August 12, 2022 (admitted on December 20, 2022, at the suppression hearing as United States Ex. 1)("April 29 Audio Recording").  See Notice of Lodging at 1, filed August 12, 2022 (Doc. 29).  While the Findings of Fact cite specifically to the April 29 Tr., which records the relevant portion of the April 29 Audio Recording, they also reflect the Court's review of the April 29 Audio Recording.

27.     Jackson told Perry he was traveling from Perris, California, to Oklahoma.[3]  See

December 20 Tr. at 16:8-20 (Cordova, Perry); April 29 Tr. at 2:11-22 (Jackson, Perry); id. at 3:9-

11 (Jackson, Perry).

28.     Perry asked Jackson to show him Jackson's bus ticket.  See December 20 Tr. at

16:25 (Perry); April 29 Tr. at 2:13-17 (Jackson, Perry).

29.     Jackson showed, but did not hand, Perry his cellular telephone to display his bus

ticket, which listed the name "Rashad Mitchell."  December 20 Tr. at 16:21-17:10 (Cordova,

Perry); April 29 Tr. at 3:3-4 (Jackson, Perry).

30.     Perry asked Jackson for his identification card.  See December 20 Tr. at 70:18-21

(Meyers, Perry); id. at 17:21 (Perry); April 29 Tr. at 3:5-8 (Jackson, Perry).

31.     Jackson handed Perry an identification card with a Georgia address, listing a June

2, 1979, date of birth, and the name Glen A. Jackson, Jr.  See December 20 Tr. at 70:22-71:16

(Meyers, Perry); id. at 19:11-16 (Cordova, Perry); Georgia Identification Card, filed December 20,

2022 (Doc. 57-2 at 8)(admitted on December 20, 2022, at the suppression hearing as United States

Ex. 2)("Jackson ID").

32.     Jackson confirmed that he was a Georgia resident.  See April 29 Tr. at 3:16-20

(Jackson, Perry).

---

[3]While both the December 20 Tr. and April 29 Tr. reference "Paris, California," there is no town in California by that name.  December 20 Tr. at 16:14 (Perry); April 29 Tr. at 2:20 (Jackson). The Court understands Jackson and Perry to have been referring to Perris, California, "an old railway city in Riverside County, California, . . . located 71 miles (114 km) east-southeast of Los Angeles and 81 miles (130 km) north of San Diego," Perris, California, Wikipedia, https://en.wikipedia.org/wiki/Perris,_California (last visited June 16, 2023), which has a Greyhound bus stop, see Greyhound Bus Stations in Perris, California, Greyhound, https://www.greyhound.com/en-us/bus-stations-in-perris (last visited June 16, 2023).

33.     After reviewing Jackson's ID for "just a few seconds," Perry returned it to Jackson. December 20 Tr. at 20:17-20 (Cordova, Perry).

34.     In Perry's experience as a DEA agent, it is common to see individuals delivering illegal narcotics to be traveling to a destination that does not correspond to their home address. See December 20 Tr. at 20:7-13 (Cordova, Perry).

35.     There were two bags on the floor next to Jackson, in front of the window seat: a white Dolce & Gabbana shopping bag on top of a black duffle bag.  See December 20 Tr. at 80:7-25 (Meyers, Perry); id. at 84:8-19 (Meyers, Perry); id. at 85:5-10 (Meyers, Perry); Photograph of Dolce & Gabbana Shopping Bag (undated), filed December 20, 2022 (Doc. 57-2 at 9)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 3)("Shopping Bag Photo"); Photograph of Black Duffle Bag (undated), filed December 20, 2022 (Doc. 57-2 at 10)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 4)("Black Duffle Bag Photo").

36.     Perry asked Jackson if Jackson was traveling with luggage, stating: "You'll see me speaking with passengers on the bus.  Do you have any luggage on the bus with you today, sir?" April 29 Tr. at 3:22-25 (Perry).

37.     When asked whether he was traveling with luggage, Jackson told Perry that he had luggage in the cargo hold and reached down to identify the white Dolce & Gabbana shopping bag as his own, but not the black duffle bag.  See December 20 Tr. at 20:24-21:9 (Cordova, Perry); April 29 Tr. at 4:1-8 (Jackson, Perry).

38.     Perry asked whether Jackson had any additional luggage in the bus cabin.  See December 20 Tr. at 22:3-6 (Cordova, Perry); April 29 Tr. at 4:9-10 (Perry).

39.     Jackson initially said he did not have any additional luggage in the bus cabin.  <u>See</u> April 29 Tr. at 4:9-11 (Jackson, Perry).

40.     Perry asked Jackson if he would "voluntarily consent for a search of the bag you have with you for contraband."  April 29 Tr. at 4:12-14 (Perry).  <u>See</u> December 20 Tr. at 22:14-19 (Cordova, Perry); <u>id.</u> at 70:14-17 (Meyers, Perry); <u>id.</u> at 71:17-20 (Meyers, Perry); April 29 Tr. at 4:16-21 (Jackson, Perry).

41.     Jackson did not answer whether he would permit Perry to search his white Dolce & Gabbana bag.  <u>See</u> December 20 Tr. at 23:8-9 (Perry); April 29 Tr. at 4:12-17 (Jackson, Perry).

42.     Jackson showed Perry the contents of the white Dolce & Gabbana bag through a voluntary self-search by opening the bag and moving his hands quickly around the bag's inside.  <u>See</u> December 20 Tr. at 22:20-24 (Cordova, Perry); <u>id.</u> at 23:9-10 (Perry); <u>id.</u> at 23:15-16 (Perry); <u>id.</u> at 86:24-87:7 (Meyers, Perry); <u>id.</u> at 88:11-19 (Meyers, Perry).

43.     In Perry's experience as a DEA agent, it is common for passengers searching their own bags in his presence to move things around inside the bag in a quick and nervous manner if they have an item they do not want a DEA agent to see.  <u>See</u> December 20 Tr. at 23:13-20 (Cordova, Perry).

44.     When Jackson was moving his hands around the inside of the white Dolce & Gabbana bag, Perry did not tell him to go slower or show him particular items in the bag.  <u>See</u> December 20 Tr. at 87:8-10 (Meyers, Perry).

45.     After moving his hands around the inside of the Dolce & Gabbana bag, Jackson left the bag on the floor.  <u>See</u> December 20 Tr. at 89:11-13 (Meyers, Perry).

46.     Perry asked Jackson a second time if he would permit Perry to search the white Dolce & Gabbana bag for contraband.  See December 20 Tr. at 23:3-5 (Cordova, Perry); id. at 23:23-25 (Perry); April 29 Tr. at 4:17-21 (Jackson, Perry).

47.     Perry did not tell Jackson that he could refuse consent to have his belongings searched.  See December 20 Tr. at 70:5-7 (Meyers, Perry).

48.     Jackson denied having contraband and said: "I don't give consent to search my stuff." April 29 Tr. at 4:22-23 (Jackson).  See December 20 Tr. at 23:25-24:2 (Perry); id. at 70:1-2 (Perry); id. at 74:14-17 (Meyers, Perry).

49.     After Jackson denied Perry consent to search his belongings, Perry told Jackson it was his right to refuse the search.  See December 20 Tr. at 24:3-13 (Cordova, Perry); id. at 70:2-3 (Perry); id. at 74:5-9 (Meyers, Perry); April 29 Tr. at 4:24-25 (Perry).

50.     Perry asked Jackson if the black duffle bag under the white Dolce & Gabbana bag belonged to Jackson.  See April 29 Tr. at 5:1-3 (Perry).

51.     Jackson identified the black duffle bag as his own.  See December 20 Tr. at 22:7-10 (Cordova, Perry); id. at 24:18-24 (Cordova, Perry); id. at 25:19-24 (Cordova, Perry); April 29 Tr. at 5:4-9 (Jackson, Perry).

52.     In Perry's experience as a DEA agent, it is common for passengers who have illegal narcotics in a bag to attempt to distance themselves from that bag by not claiming it as their luggage.  See December 20 Tr. at 25:21-26:5 (Cordova, Perry).

53.     Perry asked Jackson to show him the black duffle bag's contents.  See December 20 Tr. at 26:9-12 (Cordova, Perry); id. at 88:20-89:1 (Meyers, Perry); April 29 Tr. at 5:10-11 (Perry).

54.     Jackson handed Perry a partially-eaten strawberry before lifting his black duffle bag from the floor, arising from his seat, and placing the black duffle bag on the empty window seat next to him.  See December 20 Tr. at 26:13-18 (Cordova, Perry); id. at 72:10-16 (Meyers, Perry); id. at 89:5-10 (Perry); id. at 107:12-18 (Cordova, Perry); April 29 Tr. at 5:13-16 (Perry).

55.     Perry told Jackson, "Thank you, sir.  Don't smash your strawberries, here.  I'm going to put this back in the -- put that back in there for you.  I didn't want to hold that.  Thank you, sir."  See April 29 Tr. at 5:13-17 (Perry).

56.     Perry placed the partially-eaten strawberry into a plastic container of strawberries partially underneath Jackson's black duffle bag.  See December 20 Tr. at 72:17-21 (Meyers, Perry); id. at 90:11-19 (Meyers, Perry); id. at 91:16-23 (Meyers, Perry); April 29 Tr. at 5:13-17 (Perry).

57.     When Jackson placed the black duffle bag on the empty window seat, he stood in front of the aisle seat, facing the window, in part blocking Perry's view.  See December 20 Tr. at 26:19-25 (Cordova, Perry); id. at 90:20-23 (Meyers, Perry); id. at 91:11-15 (Meyers, Perry); id. at 107:18-20 (Perry).

58.     When Jackson placed the black duffle bag on the empty window seat, Perry stood just behind Jackson's seat, in the bus' aisle, with one foot partially behind Jackson's seat and the other foot partially in the aisle.  See December 20 Tr. at 91:7-10 (Perry).

59.     Jackson showed Perry the black duffle bag's contents through a voluntary self-search by opening the bag and moving quickly the items inside the bag.  See December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry).

60.     Jackson told Perry: "It's just got clothes in here."  April 29 Tr. at 5:18 (Jackson).

61.     Perry asked Jackson: "[W]hat's inside of the clothes?"  April 29 Tr. at 5:22-23 (Perry).  See December 20 Tr. at 28:23-24 (Cordova, Perry); id. at 102:4-9 (Meyers, Perry).

62.     Jackson responded to Perry: "Nothing."  April 29 Tr. at 5:24 (Jackson).  December

20 Tr. at 28:25-29:3 (Cordova, Perry); id. at 102:8-11 (Meyers, Perry).

63.     Perry saw bulges inside the clothing in Jackson's bag.  See December 20 Tr. at

27:16-20 (Cordova, Perry); id. at 92:6-20 (Meyers, Perry); id. at 107:25-108:1 (Perry).

64.     Perry saw thin, clear plastic inside the clothing in Jackson's bag.  See December 20

Tr. at 27:21-24 (Cordova, Perry); id. at 92:24-93:4 (Meyers, Perry); id. at 107:25-108:1 (Perry).

65.     Perry thought the plastic was vacuum-sealed or heat-sealed.  See December 20 Tr.

at 27:21-24 (Perry); id. at 29:9-15 (Cordova, Perry); id. at 37:1-5 (Cordova, Perry).

66.     In Perry's experience as a DEA agent, he had seen heat-sealed or vacuum-sealed

plastic during interdiction operations on hundreds of occasions and, every time, it contained illegal

narcotics or proceeds from the sale of illegal narcotics.  See December 20 Tr. at 29:16-30:2

(Cordova, Perry).

67.     Perry thought there were bundles of narcotics inside the plastic inside Jackson's

bulging clothing in the black duffle bag.  See December 20 Tr. at 30:3-8 (Cordova, Perry); id. at

103:7-19 (Meyers, Perry); id. at 108:2-18 (Cordova, Perry).

68.     Perry arrested and handcuffed Jackson after seeing the plastic inside Jackson's

bulging clothing in the black duffle bag.  See December 20 Tr. at 30:3-11 (Cordova, Perry); April

29 Tr. at 6:2-4 (Perry).

69.     Perry told Jackson he was under arrest "for the contents of your bag."  April 29 Tr.

at 6:9 (Perry).

70.     During Perry's interactions with Jackson on the Greyhound bus, Perry addressed

Jackson as "sir."  April 29 Tr. at 2:1 (Perry); id. 2:11 (Perry); id. at 2:24 (Perry); id. at 3:1 (Perry);

id. at 3:22 (Perry); id. at 3:25 (Perry); id. at 4:21 (Perry); id. at 5:13 (Perry); id. at 5:25 (Perry); id. at 6:2 (Perry); id. at 6:7 (Perry).

71.     During Perry's interactions with Jackson on the Greyhound bus, Perry used consistently the words "please," April 29 Tr. at 2:16 (Perry); id. at 3:8 (Perry), and "thank you," April 29 Tr. at 3:1-2 (Perry); id. at 3:5 (Perry); id. at 3:18 (Perry); id. at 3:21 (Perry); id. at 5:13 (Perry); id. at 5:17 (Perry); id. at 5:25 (Perry).

72.     Before arresting Jackson, Perry did not touch Jackson.  See December 20 Tr. at 30:12-14 (Cordova, Perry).

73.     Before arresting Jackson, Perry did not display his weapon.  See December 20 Tr. at 30:15-16 (Cordova, Perry).

74.     Before arresting Jackson, Perry did not make any threats.  See December 20 Tr. at 30:17-18 (Cordova, Perry).

75.     Before Perry arrested Jackson, Zamarron did not interact with Jackson.  See December 20 Tr. at 30:19-21 (Cordova, Perry).

76.     Before Perry arrested Jackson, Zamarron did not enter the bus' aisle.  See December 20 Tr. at 30:22-25 (Cordova, Perry).

77.     After Perry arrested Jackson, Perry or Zamarron removed from the bus the white Dolce & Gabbana bag, black duffle bag, and a blue rolling duffle bag Jackson stored in the cargo hold.  See December 20 Tr. at 31:4-12 (Cordova, Perry); April 29 Tr. at 6:14-15 (Perry); Photograph of Blue Duffle Bag (undated), filed December 20, 2022 (Doc. 57-2 at 11)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 5)("Blue Duffle Bag Photo").

**4.     DEA Inventory Search Policies and the Search Following Jackson's Arrest.**

78.     On April 29, 2022, the DEA had in effect a manual for inventory searches that

describes the DEA's inventory search policy.  See December 20 Tr. at 37:14-39:9 (Court, Cordova,

Meyers, Perry); DEA Inventory Search Policy (undated), filed December 20, 2022 (Doc. 57-2 at

13)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 7)("Inventory

Search Policy").

79.     The Inventory Search Policy states:

> A complete inventory shall be made of all property that is taken into custody
> by DEA for safekeeping, regardless of whether probable cause exists to search the
> property.  Inventory searches are made to identify items of value in order to protect
> DEA personnel from claims of theft or loss of property that enters DEA Custody.
> Inventory searches need not be made contemporaneous with the arrest of any
> person or at the time of seizure, but must be made as soon as practical after the
> property to be searched has been transported to a DEA or other law enforcement
> facility.  Inventory searches shall be made of all containers, whether locked or
> unlocked, that are lawfully seized for safekeeping.  All items shall be inventoried
> on a DEA-12, Receipt for Cash or Other Items, and the details of the inventory shall
> be reported in the DEA-6 that reports the related enforcement agency.

Inventory Search Policy at 1.

80.     In his capacity as a special DEA agent, Perry conducts inventory searches of all

items he takes into custody after an arrest, regardless whether he believes the bags contain

narcotics.  See December 20 Tr. at 38:10-20 (Cordova, Perry); id. at 104:2-105:12 (Meyers, Perry).

81.     DEA agents, including Perry, searched all three of Jackson's bags in a processing

room at the Albuquerque DEA office.  See December 20 Tr. at 32:6-17 (Cordova, Perry); id. at

105:13-106:1 (Meyers, Perry); Shopping Bag Photo; Black Duffle Bag Photo; Blue Duffle Bag

Photo.

82.     The DEA did not have a search warrant for Jackson's bags at the time it searched

them in the Albuquerque DEA office.  See December 20 Tr. at 105:20-22 (Meyers, Perry).

- 14 -

83.     At the time of the search at the Albuquerque DEA office, Jackson was under arrest for the suspected bundles inside the black duffle bag, and his bags were in DEA custody.  See December 20 Tr. at 105:23-106:4 (Meyers, Perry).

84.     In the white Dolce & Gabbana shopping bag, the DEA found 1.10 gross kilograms of heroin in a clear plastic, heat-sealed bundle.  See December 20 Tr. at 32:18-33:8 (Cordova, Perry).

85.     In the black duffle bag, the DEA found 3.25 gross kilograms of marijuana in six clear plastic, heat-sealed bundles.  See December 20 Tr. at 33:9-22 (Cordova, Perry); id. at 35:5-20 (Cordova, Perry); Photograph of Six Bundles (undated), filed December 20, 2022 (Doc. 57-2 at 12)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 6)("Six Bundles Photo").

86.     A DEA-6 form is a report of investigation on which Perry documents an inventory search and any items recovered during an inventory search.  See December 20 Tr. at 34:8-9 (Cordova, Perry); id. at 39:22-40:6 (Cordova, Perry).

87.     Perry made a record of the narcotics found on a DEA-6 form.  See December 20 Tr. at 33:23-34:3 (Cordova, Perry); id. at 33:8-9 (Cordova, Perry); id. at 39:12-21 (Cordova, Perry); DEA-6 Form (dated May 6, 2022), filed December 20, 2022 (Doc. 57-2 at 15-17)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 8)("DEA-6").

88.     A DEA-7 form is a laboratory report on which the DEA lists the seized drugs it sends to a laboratory for analysis.  See December 20 Tr. at 34:4-7 (Cordova, Perry).

89.     Perry made a record of the narcotics found on a DEA-7 form.  See December 20 Tr. at 33:23-34:3 (Cordova, Perry).

90.     A DEA-7A form is a non-drug evidence report.  <u>See</u> December 20 Tr. at 34:13-14 (Perry).

91.     Perry made a record of Jackson's bags on a DEA-7A form.  <u>See</u> December 20 Tr. at 34:10-14 (Cordova, Perry).

92.     A DEA-12 form is a receipt for cash or other items, on which the DEA lists seized personal property, pursuant to the Inventory Search Policy.  <u>See</u> December 20 Tr. at 35:2-4 (Cordova, Perry); <u>id.</u> at 42:10-13 (Cordova, Perry); <u>id.</u> at 44:4-8 (Cordova, Perry).

93.     Perry helped create a record of the non-narcotic items found in Jackson's bags on a DEA-12 form.  <u>See</u> December 20 Tr. at 34:20-35:1 (Cordova, Perry); <u>id.</u> at 42:10-43:22 (Cordova, Perry); DEA-12 Form (dated May 9, 2022), filed December 20, 2022 (Doc. 57-2 at 18)(admitted on December 20, 2022, at the suppression hearing as United States Ex. 9)("DEA-12").

94.     The DEA sent the non-narcotic items found in Jackson's bags "to the ADO Non-Drug Evidence Custodian for storage and safekeeping."  DEA-6 ¶¶ 3-6, at 3.

95.     The DEA ultimately returned the non-narcotic items found in Jackson's bags to Jackson's attorney.  <u>See</u> December 20 Tr. at 34:20-23 (Cordova, Perry); <u>id.</u> at 43:11-18 (Cordova, Perry).

## <u>PROCEDURAL HISTORY</u>

The United States filed the Criminal Complaint on April 29, 2022 (Doc. 2)("Complaint"), against Jackson for violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) through "[p]ossession of one kilogram and more of heroin with intent to distribute."  Complaint at 1.  The Complaint attaches an Affidavit to provide probable cause to support the Complaint.  <u>See</u> Complaint at 2-3. The Affidavit describes the events that occurred on April 29, 2022, which led to Jackson's arrest

and the discovery of heroin in Jackson's bag.  See Complaint at 2-3.  On May 25, 2022, the Grand

Jury indicted Jackson under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), for possession with intent to

distribute one kilogram and more of heroin.  See Indictment at 1, filed May 25, 2022 (Doc. 15).

On May 22, 2022, Jackson filed his Suppression Motion.  See Suppression Motion at 1-18.

In the Suppression Motion, Jackson asks the Court to suppress and exclude "all evidence, physical

and testimonial, obtained or derived from or through or as a result of the Drug Enforcement

Agency's (DEA) unlawful search, seizure, interrogation, arrest, and detention which occurred on

or about April 29, 2022 in Albuquerque, New Mexico."  Suppression Motion at 1.  Jackson

contends that the DEA violated his rights under the Fourth Amendment to the Constitution of the

United States of America by "1) detaining Defendant without any reasonable suspicion; and

2) deliberately using coercion to conduct an unlawful search and seizure; conducting an illegal

search of Defendant's belongings or arresting the Defendant based on his hunch of possible

criminal activity."  Suppression Motion at 1.  Jackson alleges that Perry's discovery of heroin in

his bag occurred after Perry subjected Jackson to an illegal detention and unconstitutional search

of his luggage.  See Suppression Motion at 6.  Jackson contends that, because all the evidence of

his crime "flow[s] from the unconstitutional detention, seizure, search, and arrest," and because

there are "no intervening circumstances to attenuate the taint," the Court should suppress and

exclude all of the United States' evidence of Jackson's alleged crime.  Suppression Motion at 7.

Jackson adds that "the misconduct of the DEA agent was both intentional and flagrant."

Suppression Motion at 7.

In arguing that Perry subjected Jackson to an unlawful seizure, Jackson states:

Defendant was informed he could not leave and was going to get searched no matter
what when Agent Perry explained that "we check the bus here."  He was further
wrongfully detained when Agent Perry told him he could not move from where he

was sitting: "Don't smash your strawberries here."  Although the encounter may ostensibly have had some of the makings of a consensual encounter, the DEA agent's actions and statements transformed it into a wrongful detention and then seizure.

Suppression Motion at 10.  Jackson alleges that "Agent Perry asked Defendant about his travels, viewed his travel documents, then immediately asked to search Defendant's luggage," and that, when Jackson did not consent, "Agent Perry requested or ordered Defendant to open his bag and show him the contents of it."  Suppression Motion at 10.  Jackson contends that he "was seized and detained and forced to wait on the bus when he was told that the agent was going to check the bus and he wasn't to move."  Suppression Motion at 10.  Jackson emphasizes that "[w]e do not know how Defendant came to the attention of the agent or how his behavior suggested criminal activity," and that, "[a]t its essence, the encounter was an unlawful detention and seizure because Defendant was not free to leave after his initial contact with Special Agent Perry."  Suppression Motion at 11.

Jackson argues that Perry coerced him into opening his luggage and that, therefore, the search which yielded the heroin was not voluntary.  See Suppression Motion at 11-16.  Supporting his coercion argument, Jackson states:

> In this case, individual acts of inducement, trickery and deception, accumulated to the extent that Defendant reasonably believed that he was unable to refuse consent, leave, or terminate the encounter with Mr. Perry.  It started when Agent Perry, without any reasonable suspicion, approached several persons on the bus and attempted to search them.  Then, Mr. Perry lied to the Defendant by saying "we check the bus here."  This statement was made to inform the Defendant that he was not free to leave or deny permission to do as the agent pleased.

Suppression Motion at 13.  Jackson contends that, "[b]y being vague and inaccurate as to his purpose, Mr. Perry deprived Mr. Jackson of an opportunity to understand the situation, let alone exercise his right to terminate the encounter and leave."  Suppression Motion at 14.  Jackson

alleges that Perry told him not to move, and stood blocking access to the aisle and looking over Jackson's shoulder.  See Suppression Motion at 14.  Jackson points to Perry not having read him his Miranda rights before the alleged detention and search as a "sign of . . . elaborate governmental deception that was deployed in this matter."  Suppression Motion at 16.  Jackson urges the Court to look to the totality of the circumstances surrounding the encounter between Jackson and Perry to conclude that the "Defendant's consent was invalid because it was the product of coercion and deception."  Suppression Motion at 16.

Finally, Jackson contends that Perry had neither reasonable suspicion to detain Jackson nor probable cause to arrest him.  See Suppression Motion at 16-18.  Jackson contends that "all of the evidence seized immediately after this unreasonable seizure and subsequent search without reasonable suspicion must be suppressed, because after seizing the bag the Agent arrested Mr. Jackson without probable cause or a search warrant," and that "[n]o exigent circumstances existed to justify the warrantless search and seizure in this matter."  Suppression Motion at 17.  Jackson proceeds to dispute Perry's account of what he saw when searching Jackson's bag.   See Suppression Motion at 17-18.  Specifically, Jackson states:

> If Mr. Perry saw bundles bulging from inside clothing, he could not have seen plastic wrapping as he alleged.  He would only have seen bulges covered by clothing.  The plastic wrapping obviously was covered by clothing.  The Defendant points out that when he asked why he was being arrested, Mr. Perry solely stated, "for the contents of your bag."  Exhibit A @15:22.  He did not say he was being arrested because there were narcotics in the bag, or that he likely possessed narcotics, or that he saw narcotics.  Mr. Jackson was arrested based on a hunch.  Even if Mr. Perry did see a bundle that was bulging inside clothing, that is consistent with innocent behavior.

Suppression Motion at 17-18.[4]  Jackson concludes his Suppression Motion by requesting that the

Court hold an evidentiary hearing.  See Suppression Motion at 18.

The United States responds to the Suppression Motion.  See United States' Response to

Defendant's Motion to Suppress Evidence, filed August 12, 2022 (Doc. 28)("Suppression Motion

Response").  The United States' first argument in the Suppression Motion Response is that Perry

did not seize Jackson before his arrest, but instead engaged in a consensual encounter with him.

See Suppression Motion Response at 8-13.  The United States contends that "Perry requested

permission to speak with Jackson, and once Jackson acquiesced, Agent Perry engaged in permitted

conduct."  Suppression Motion Response at 8.  The Suppression Motion Response invokes United

States v. Tafuna, 5 F.4th 1997 (10th Cir. 2021), which establishes an eight-non-exclusive-factor

test to determine whether an encounter between a civilian and a law enforcement officer is

consensual.[5]  See Suppression Motion Response at 9 (citing United States v. Tafuna, 5 F.4th at

1200-01).  The United States applies the United States v. Tafuna factors to Jackson's interaction

---

[4]The citation to "Exhibit A @15:22" in this excerpt from the Suppression Motion corresponds to the following transcript citation: April 29 Tr. at 6:9 (Perry).

[5]The eight non-exclusive factors United States v. Tafuna examines are:

(1) the location of the encounter, particularly whether it occurred in an open place within the view of people other than officers or a small, enclosed space without other members of the public nearby; (2) the number of officers involved; (3) whether an officer touched the defendant or physically restrained the defendant's movements; (4) the officer's attire; (5) whether the officer displayed or brandished a weapon; (6) whether the officer used aggressive language or tone of voice that indicated compliance with a request might be compelled; (7) whether and for how long the officer retained the defendant's personal effects, such as identification; and (8) whether the officer advised the defendant that he had the right to terminate the encounter."

5 F.4th at 1200-01 (citing United States v. Lopez, 443 F.3d 1280, 1284 (10th Cir. 2006)).

with Perry, and contends that all but one of the test's factors indicate that the encounter was consensual.  See Suppression Motion Response at 9.  In contending that the encounter was consensual, the United States emphasizes that: (i) the encounter occurred in view of other people; (ii) only one officer -- Perry -- interacted with Jackson; (iii) neither Perry nor Zamarron touched or restrained Jackson, wore uniforms, or displayed their weapons; (iv) Perry used a friendly and not aggressive tone while conversing with Jackson; (v) after reviewing Jackson's ID, Perry returned it immediately; and (vi) Jackson's statements to Perry indicate that Jackson likely knew that he had the right to terminate the encounter.  See Suppression Motion Response at 9-13. Regarding the pre-arrest opening of Jackson's duffle bag, the United States argues that Jackson voluntarily showed Perry its contents by implied consent.  See Suppression Motion Response at 13-14.  Further, the United States contends that Jackson gave Perry his consent freely and voluntarily, without being subject to trickery or deception, and after Perry informed him that he was free to refuse consent.  See Suppression Motion Response at 14-17.  Further, the United States contends that Perry had probable cause to arrest Jackson and seize his luggage after discovering bundles wrapped in clothing and vacuum-sealed plastic in one of his bags.  See Suppression Motion Response at 17-19.  The United States asserts that the following factors constitute probable cause to search the duffle bag: (i) Jackson's use of a false name; (ii) Jackson's travel route including an origin and destination that were different from his stated residence; (iii) Jackson's lying about the number of carry-on items with which he was traveling; (iv) Jackson's attempt to block Perry's view of his bag as he was opening it; (v) Perry's seeing bundles wrapped in clothing in Jackson's bag; (vi) Perry's seeing vacuum-sealed plastic in Jackson's bag; and (vii) Jackson's denial that his clothes contained any other items, even though Perry could see other items hidden in Jackson's clothes.  See Suppression Motion Response at 17-18.  Finally, the United States

asserts that the post-arrest search of Jackson's bags was consistent with the Fourth Amendment, either because it was an inventory search under the DEA Inventory Policy or because, under the plain-view doctrine, the presence of narcotics was a foregone conclusion, on the basis of what Perry saw when Jackson showed him inside his bag.  See Suppression Motion Response at 19-23. The United States attempts to distinguish this case from United States v. Johnson, 43 F.4th 1100 (10th Cir. 2022)("Johnson"), another case involving Perry in which the United States Court of Appeals for the Tenth Circuit concludes that two warrantless searches of the defendant's luggage violated the Fourth Amendment, because it was not a foregone conclusion that the luggage contained illegal narcotics.  See Suppression Motion Response at 22-23.

On September 9, 2022, Jackson filed his Supplemental Suppression Motion.  See Supplemental Suppression Motion at 1-30.  Much of Jackson's Supplemental Suppression Motion restates the arguments Jackson raised in his original Suppression Motion, although the Supplemental Suppression Motion contains additional detail regarding the factual allegations in the case, as well as new legal contentions and responses to the points that the United States makes in its Response.  Compare Suppression Motion at 1-18, with Supplemental Suppression Motion at 1-30.  The Supplemental Suppression Motion includes a request to suppress additional evidence, i.e., that obtained from Jackson's post-arrest questioning at the DEA office.  See Supplemental Suppression Motion at 5.  Among the substantive additions in the Supplemental Suppression Motion is Jackson's attempt to refute the United States' argument that Perry had probable cause to arrest Jackson.  See Supplemental Suppression Motion at 20-22.

The primary new argument that the Supplemental Suppression Motion presents is that, even if there were probable cause to arrest Jackson, the DEA would need a warrant to legally search Jackson's luggage.  See Supplemental Suppression Motion at 22-29.  The Supplemental

Suppression Motion emphasizes that this case is factually similar to <u>Johnson</u> on the grounds that it was not a foregone conclusion that Jackson's bags contained illegal narcotics.  <u>See</u> Supplemental Suppression Motion at 23-25.  Jackson argues that the plain view doctrine does not apply, because Perry lacked the "knowledge approaching certainty" that Jackson's bag contained narcotics, which <u>United States v. Corral</u>, 970 F.2d 719, 725 (10th Cir. 1992), requires.  Supplemental Suppression Motion at 24.  Jackson contends:

> Prior to the search of the carry-ons at the DEA office, Mr. Perry only knew that Mr. Jackson said the bag contained clothing, and, if the Court is to believe him, there was something in plastic within the clothing.  The idea of having plastic inside of clothes is not 'knowledge approaching certainty' that the carry-on contained contraband.

Supplemental Suppression Motion at 25.  Regarding the United States' inventory-search arguments, Jackson emphasizes that "[i]t matters not that the government calls the search and [sic] inventory search even though it was an investigative search."  Supplemental Suppression Motion at 24.  Jackson contends that the fruit-of-the-poisonous-tree doctrine, which the Supreme Court elaborated in <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), makes the search of Jackson's bags at the DEA office impermissible.  See Supplemental Suppression Motion at 25-28.  Jackson contends that, "since the detention, search and seizure in this matter were not consensual and the items were not lawfully seized, the DEA's own policy was violated, making the inventory search unlawful as a matter of law."  Supplemental Suppression Motion at 29.  Jackson contends that the post-arrest search of Jackson's possessions is unlawful under the fruit-of-the-poisonous-tree doctrine.  <u>See</u> Supplemental Suppression Motion at 29.  In arguing that the search at the DEA office is impermissible under the fruit-of-the-poisonous-tree doctrine, Jackson maintains that "the government appears to support the idea that as long as items seized are subjected to an inventory, they should be admissible in evidence," and that "[t]his would obliterate the Fruit of the Poisonous

Tree Doctrine and encourage police misconduct in the most extreme fashion."   Supplemental

Suppression Motion at 29.

The United States responds to the Supplemental Suppression Motion.  See United States'

Response to Defendant's Supplemental Motion to Suppress Evidence, filed December 13, 2022

(Doc. 54)("Supplemental Suppression Motion Response").   In the Supplemental Suppression

Motion Response, the United States contends that "[n]one of Jackson's amended arguments rebut

the fact that (1) Jackson was not seized before his arrest; (2) he voluntarily opened his bag;

(3) Perry had probable cause to arrest him; and (4) agents conducted a permissible inventory search

of his luggage."   Supplemental Suppression Motion Response at 4.   The United States further

contends that "Jackson's amended arguments also do not rebut the fact that the discovery of

narcotics was inevitable, and that Perry's ability to see bundles wrapped in clothing and a portion

of vacuum sealed plastic made it a foregone conclusion that Jackson's duffle bag contained

narcotics or proceeds therefrom."   Supplemental Suppression Motion Response at 4.   Addressing

seizure arguments new to Jackson's Supplemental Suppression Motion, the United States

maintains that: (i) Perry did not deceive Jackson and had no duty to inform Jackson of Jackson's

right to refuse a search; and (ii) Perry's moving to the bus' aisle during his interaction with Jackson

does not weigh in favor of a conclusion that Perry seized Jackson.   See Supplemental Suppression

Motion Response at 4-6.   The United States contends that Jackson's new argument that Perry said

"I'm sure you saw me" to Jackson in reference to his arresting another individual is unpersuasive

as proof of coercion.   Supplemental Suppression Motion Response at 6-7.   Regarding probable

cause to arrest Jackson and seize his bags, the United States contends that Jackson is wrong on the

law and that his arguments -- regarding the use of a false name, not admitting to having two carry-

on bags, the presence of bulges under Jackson's clothes in his bag, and Jackson's traveling to and

from addresses that are not his own -- are unavailing.  See Supplemental Suppression Motion Response at 7-9.  Finally, the United States contends that the post-arrest search of Jackson's bags is lawful: (i) as an inventory search; (ii) under the inevitable-discovery doctrine; and (iii) under the plain-view doctrine.  See Supplemental Suppression Motion Response at 10-17.

On December 20, 2022, the Court held an evidentiary hearing on the Suppression Motion and Supplemental Suppression Motion.  See Clerk's Minutes at 1.  At the hearing, the United States called Perry to testify.  See December 20 Tr. at 3:22-44:12 (Court, Cordova, Meyers, Perry).  Other than Perry, neither the United States nor Jackson put forth any additional witnesses or evidence.  See December 20 Tr. at 109:2-8 (Court, Cordova, Meyers).

The Court then heard the parties' arguments on the Suppression Motion and Second Suppression Motion.  See December 20 Tr. at 109:9-121:23 (Court, Cordova, Meyers).  During Jackson's argument, Jackson clarified his position that the Court should suppress all evidence from the beginning of Perry's encounter with Jackson, because Jackson's encounter with Perry was not consensual.  See December 20 Tr. at 110:12-22 (Court, Meyers).  Further, Jackson contended that Perry's search of Jackson's bags on the bus was nonconsensual and that, after the search, "there was no probable cause then to arrest Mr. Jackson.  There was nothing in plain view.  There was not a foregone conclusion [that Jackson's bags contained illegal narcotics].  And there was no reason to contain an inventory search other than for investigative reasons."  December 20 Tr. at 111:6-11 (Meyers).  The Court then questioned Jackson regarding Jackson's arguments in light of Johnson, another case involving Perry, with specific reference to Jackson's arguments about probable cause, see December 20 Tr. at 111:15-112:15 (Court, Meyers), and the non-applicability of the plain-view exception, see December 20 Tr. at 112:16-114:21 (Court, Meyers).  Jackson then made the argument that the post-arrest search of his bags was investigatory, required a warrant,

and was not permissible as an inventory search.  See December 20 Tr. at 115:7-116:25 (Court, Meyers).

Next, the United States made its arguments in opposition to the Suppression Motion and Supplemental Suppression Motion.  See December 20 Tr. at 117:11-121:23 (Court, Cordova).  The United States contended that it has stronger plain-view arguments, see December 20 Tr. at 117:21-118:4 (Court, Cordova), and foregone-conclusion arguments, see December 20 Tr. at 118:6-119:12 (Court, Cordova), than it had in Johnson.  The United States then maintained that the post-arrest search of Jackson's bags is justified as an inventory search in keeping with the DEA Inventory Search Policy.  See December 20 Tr. at 119:7-121:2 (Court, Cordova).

After the hearing, Jackson filed the Supplemental Brief, filed February 12, 2023 (Doc. 59).  In the Supplemental Brief, Jackson emphasizes that the "the search of Mr. Jackson's bags was NOT an inventory search.  Rather, as tacitly admitted by Agent Perry, the search was done for purely investigatory reasons."  Supplemental Brief at 1 (emphasis in Supplemental Brief).  Jackson contends that, "even if Agent Perry had probable cause, a search warrant was required to search Mr. Jackson's bags."  Supplemental Brief at 1.  Citing Colorado v. Bertine, 479 U.S. 367, 372 (1987), and United States v. Edwards, 632 F.3d 633, 644 (10th Cir. 2001), Jackson states that "[i]nventory searches are unlawful when, like here, the sole purpose is to investigate criminal activity."  Supplemental Brief at 2.  Jackson characterizes the post-arrest search of Jackson's bags at the DEA office as "a pretext for an investigative search as Agent Perry had not confirmed the bags' contents prior to arresting Mr. Jackson and seizing his bags."  Supplemental Brief at 2.  Indeed, Jackson contends that, "even if the arrest of Mr. Jackson was somehow valid, the subsequent 'inventory' search was made exclusively for an investigative purpose and as such was completely unlawful."  Supplemental Brief at 2.  Jackson contends that Perry was not certain of

what Jackson's seized bags contained and "needed to learn what precisely was in Mr. Jackson's bags," and, therefore, "the decision to conduct the so-called 'inventory search' could be for no other purpose than an investigatory one."  Supplemental Brief at 2.  Further, Jackson emphasizes:

> Otherwise, it begs the question: without knowing what was in the contents of the bags, with what crime could Mr. Jackson have been charged?  It was only through the further investigation conducted under the guise of an inventory that such question could be answered.  This leads to the inescapable conclusion that the search was investigatory in nature.  As such, without a warrant, the seized items must be suppressed.

Supplemental Brief at 3-4.

The United States responded to Jackson's Supplemental Brief on February 24, 2023.  See United States' Response to Defendant's Supplemental Post-Suppression Hearing Brief, filed February 24, 2023 (Doc. 61)("Supplemental Brief Response").  The United States maintains that "[a]gents conducted a permissible inventory search of Jackson's bags because (1) the search was conducted pursuant to DEA's written inventory policy; and (2) Jackson failed to meet his burden to show that the inventory search was conducted in bad faith."  Supplemental Brief Response at 1.  The United States cites the standard for valid inventory searches in United States v. Tueller, 349 F.3d 1239 (10th Cir. 2003), i.e., they must be "conducted according to standardized procedure," and "the policy or practice governing inventory searches are designed to produce an inventory."  Supplemental Brief Response at 2 (citing 349 F.3d at 1243).  The United States emphasizes that the DEA maintains such a policy and that "it is standard practice, when conducting interdiction, to take a passenger's bags into custody whenever an arrest is made.  This practice is reasonable."  Supplemental Brief Response at 2.  Further, the United States maintains:

> In situations like Jackson's, there are but two options following an arrest: (1) take custody of the passenger's bags, or (2) leave them to be claimed by anyone who wishes.  Here, Jackson was traveling alone on an interstate bus.  Thus, taking custody of his bags upon his arrest was wholly reasonable.

Supplemental Brief Response at 2.  In support of this practice, the United States cites authority

from multiple cases in which agents took custody of a person's property when arresting that person

outside his or her home.  See Supplemental Brief Response at 2-3.  The United States maintains

that the DEA conducted the post-arrest search of Jackson's bags pursuant to the terms of its

inventory search policy.  See Supplemental Brief Response at 3.  Additionally, the United States

contends that Jackson does not meet his burden to prove that the United States conducted the post-

arrest inventory search of Jackson's bags in bad faith.  See Supplemental Brief Response at 3.

First, the United States maintains that "Jackson did not offer any evidence of bad faith," only "the

inference of bad faith."  Supplemental Brief Response at 3.  The United States states that "a general

motivation to uncover incriminating evidence" is insufficient to constitute bad faith.  Supplemental

Brief Response at 4.  Second, the United States attempts to refute Jackson's argument that Perry

conducted the inventory search to learn what Jackson's bags contained by distinguishing between

Jackson's three bags.  See Supplemental Brief Response at 4-5.  Specifically, the United States

notes that "Jackson ignores that Agent Perry only saw bundles in a singular bag, Jackson's black

duffle bag," and that Jackson "fails to explain what bad faith led to the inventory of Jackson's

other two bags: the white shopping bag . . . and the blue and black roller bag."  Supplemental Brief

Response at 4.  Jackson emphasizes:

> Even if Jackson is correct that Agent Perry's motives necessitated a warrant for his
> duffle bag -- he is not -- that does not explain why a warrant was needed to search
> the other bags.  Especially when they were merely collected for safekeeping,
> inventoried pursuant to DEA's policy, and Agent Perry never saw anything in those
> bags to suggest they contained narcotics.  Even assuming bad faith with respect to
> the duffle bag . . . , there is nothing to suggest bad faith with respect to the roller
> bag . . . , or white shopping bag . . . containing heroin.

Supplemental Brief Response at 4-.  Finally, the United States argues that "Jackson's argument ignores the inevitable discovery doctrine."  Supplemental Brief Response at 5.  The United States emphasizes that, "[b]ecause Jackson was arrested, an inventory of his luggage was inevitable. Even if Agent Perry applied for a warrant to search Jackson's duffle bag, he still would have needed to conduct an inventory search of *all* Jackson's luggage."  Supplemental Brief Response at 5.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011) (Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause.  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. Of Educ. Of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. V.

Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. at 357(footnotes omitted).

### 1.      Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky. V. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848

(quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53(quoting Skinner v. Ry. Lab. Execs.' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States,

490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .").

As the Honorable Elena Kagan, Associate Justice of the Supreme Court of the United States of America, has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.   The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).   Similarly, in Vernonia School Dist. 47J v. Acton, the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court of the United States of America, writing for the majority, notes: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654.

### 2.    Consensual Searches.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not violate the Fourth Amendment, even if the

officers do not have a search warrant.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given, including:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. February 19, 2010)(Browning, J)(first alteration in United States v. Sedillo, but not United States v. Ledesma; fourth alteration in United States v. Sedillo, but not United States v. Anderson).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  In addition, the Tenth Circuit states:

> In determining whether a consent to a search is voluntary, a court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.

United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994).  The inquiry is an objective one.

See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."  United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be

ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.  Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d 784, 789-90 (10th Cir. 2007).  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'").  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d at 1175.

For example, in United States v. Gordon, 173 F.3d 761 (10th Cir. 1999), the suspect moved to suppress all physical evidence that an officer had seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at 765.  The officer asked the suspect whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765.  When the officer encountered the suspect's locked bag, she asked him if the suspect could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]."  173 F.3d at 766.  On review, the Tenth Circuit concludes that the suspect's "voluntary relinquishment

of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765. The Tenth

Circuit describes how the search of the locked bag, which was inside the suspect's other luggage,

did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766.

The ultimate issue in determining the scope of consent is what a reasonable person would

have understood the suspect's consent to include. See United States v. Wacker, 72 F.3d 1453,

1470 (10th Cir. 1995). The Tenth Circuit determines whether a search remains within the

boundaries of the consent given based on the totality of the circumstances. See United States v.

Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). When an officer tells a suspect the object of his or

her search and the suspect consents to a search for that object within a certain area, the Tenth

Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any

area within the confines of the officer's request where the object may be found. United States v.

Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he

consented to a search of any area in the motel room where one might hide drugs"). See United

States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope

of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they

found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470

(holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in

searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding

that the removal of "a few screws from the strip holding down the carpet which covered the metal

compartment containing the packages of cocaine" did not exceed the scope of consent to search

the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the

defendant consented to a search of his apartment for another person, he consented to the search of

any area large enough to accommodate that individual).

Notably, if a suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon, the Tenth Circuit concludes it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasizes in United States v. Gordon: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

> **3.      Probable Cause for Search Warrants.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant."  United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983)), aff'd, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between

suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d

927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation

marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238).  See United States v. Glover, 104 F.3d

1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a

finding of probable cause, the court must review the affidavit as a whole and look to the totality of

the information contained therein), abrogated on other grounds by Corley v. United States, 556

U.S. 303 (2009).  In making his or her determination, the magistrate judge "may draw reasonable

inferences from the material provided in the warrant application."  United States v. Rowland, 145

F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of

probable cause . . . ."  United States v. Reed, 195 F. App'x at 822.  The Court's duty is "simply to

ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause

existed."  Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United

States, 362 U.S. at 271).  This deference is appropriate to further the Fourth Amendment's strong

preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas,

378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should

begin with the rule 'that the informed and deliberate determinations of magistrates empowered to

issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United

States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates,

462 U.S. 213.  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."  United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless."  United States v. Alabi, 943 F. Supp. 2d 1201, 1253-54 (D.N.M. 2013) (Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished).  "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause."  United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006).  Specifically, the Court should not defer to a magistrate judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

### 4.    Inventory Searches of Personal Items.

An inventory search, in which the police "search the personal effects of a person under lawful arrest as a part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect . . . . [,] constitutes a well-defined exception to the warrant requirement."  Illinois v. Lafayette, 462 U.S. 640, 643 (1983).  See South Dakota v. Opperman, 428 U.S. 364, 372 (1976).  An inventory search "is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration."  Illinois v. Lafayette, 462 U.S. at 644.  The justification for an inventory search "does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search."  Illinois v.

Lafayette, 462 U.S. at 644.  See Colorado v. Bertine, 479 U.S. at 371 ("The policies behind the

warrant requirement are not implicated in an inventory search." (citing South Dakota v. Opperman,

428 U.S. at 370 n.5)).  "[R]easonable police . . . inventory procedures administered in good faith

satisfy  the  Fourth  Amendment."   United  States  v.  O'Neil,  62  F.4th  1281,  1292  (10th  Cir.

2023)(quoting United States v. Taylor, 592 F.3d 1104, 1108 (10th Cir. 2010)(quoting Colorado v.

Bertine, 479 U.S. at 374))(alteration and ellipsis in United States v. O'Neil and United States v.

Taylor, but not Colorado v. Bertine).  It is the United States' burden to demonstrate that an

inventory search is reasonable.  See United States v. O'Neil, 62 F.4th at 1292.

    In weighing whether an inventory search is reasonable, courts must "'balanc[e] its intrusion

on the individual's Fourth Amendment interests against its promotion of legitimate governmental

interests.'"  Illinois v. Lafayette, 462 U.S. at 644 (quoting Delaware v. Prouse, 440 U.S. 648, 654

(1979))(alteration in Illinois v. Lafayette, but not in Delaware v. Prouse).  Regarding the United

States' interests in inventory searches, the Supreme Court has stated:

> A range of governmental interests support an inventory process.  it is not unheard
> of for persons employed in police activities to steal property taken from arrested
> persons;  similarly,  arrested  persons  have  been  known  to  make  false  claims
> regarding what was taken from their possession at the stationhouse.  A standardized
> procedure for making a list or inventory as soon as reasonable after reaching the
> stationhouse not only deters false claims but also inhibits theft or careless handling
> of articles from the arrested person.  Arrested persons have also been known to
> injure themselves -- or others -- with belts, knives, drugs, or other items on their
> person while being detained.  Dangerous instrumentalities -- such as razor blades,
> bombs, or weapons -- can be concealed in innocent-looking articles taken from the
> arrestee's  possession.   The  bare  recital  of  these  mundane  realities  justifies
> reasonable measures by police to limit these risk -- either while the items are in
> police possession or at the time they are returned to the arrestee upon his release.
> Examining all the items removed from the arrestee's person or possession or listing
> or inventorying them is an entirely reasonable administrative procedure.  It is
> immaterial whether the police actually fear any package or container; the need to
> protect against such risks arises independent of a particular officer's subjective
> concerns . . . .  Finally, inspection of an arrestee's personal property may assist the
> police in ascertaining or verifying his identity.

Illinois v. Lafayette, 462 U.S. at 646.  "Inventory searches are 'not treated as investigative searches because they serve three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger."'"  United States v. O'Neil, 62 F.4th at 1292 (quoting United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003)(quoting South Dakota v. Opperman, 428 U.S. at 369)).   "The governmental interests underlying a stationhouse search of the arrestee's person and possession may in some circumstances be even greater than those supporting a search immediately following arrest."  Illinois v. Lafayette, 462 U.S. at 645.  The Supreme Court has concluded that it is "entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed," and that "[e]xamining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure."  Illinois v. Lafayette, 462 U.S. at 647.

An inventory search must be done, however, "in accordance with established inventory procedures."  Illinois v. Lafayette, 462 U.S. at 648.  "An inventory search is unconstitutional unless conducted 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'"  United States v. O'Neil, 62 F.4th at 1292 (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)(quoting Colorado v. Bertine, 479 U.S. at 375), and citing United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997)).  "The policy or practice governing inventory searches should be designed to produce an inventory."  Florida v. Wells, 495 U.S. at 4.  "[I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion."  Florida v.

<u>Wells</u>, 495 U.S. at 4.  A court can consider an officer's testimony regarding the procedures and the purpose of the search as evidence.  <u>See</u> <u>United States v. Lugo</u>, 978 F.2d 631, 637 (10th Cir. 1992).  The Tenth Circuit has stated that its "precedent does not require the government to produce standard inventory procedures in writing."  <u>United States v. O'Neil</u>, 62 F.4th at 1292.  <u>See</u> <u>Molina v. Spanos</u>, 208 F.3d 226, (10th Cir. 1999)(Table)(stating that having a "standardized procedure" concerning inventory searches does not require a written policy); <u>United States v. Jacquez</u>, 409 F. Supp. 2d 1286, 1298 (D.N.M. 2005)(Browning, J.)("Although there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient to meet the standard procedure test articulated in <u>United States v. Lugo</u>.").

If an inventory search is conducted pursuant to department policy, for such a search to be unconstitutional, the officers must have acted out of bad faith, for the sole purpose of investigation. <u>See</u> <u>Colorado v. Bertine</u>, 479 U.S. at 371 ("[T]here was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."); <u>United States v. Sanchez</u>, 720 F. App'x 964, 970 (10th Cir. 2018)(unpublished)("An inventory search is invalid only if it is undertaken for the "<i>sole</i> purpose of investigation." (quoting <u>Colorado v. Bertine</u>, 479 U.S. at 372)(emphasis in <u>United States v. Sanchez</u>, but not in <u>Colorado v. Bertine</u>)); <u>United States v. Moraga</u>, 76 F. App'x 223, 228 (10th Cir. 2003)(unpublished)("Inventory searches must be conducted according to standardized procedures, and the police must act in good faith and cannot search for the sole purpose of investigation.").  Inventory searches, however, "'must not be a ruse for a general rummaging in order to discover incriminating evidence.'"  <u>United States v. Martinez</u>, 512 F.3d 1268, 1274 (10th Cir. 2008)(quoting <u>Florida v. Wells</u>, 495 U.S. at 4).  <u>See</u> <u>United States v. Tueller</u>, 349 F.3d at 1243.  "'While mixed motives or suspicions undoubtedly exist in many inventory searches, such motives or suspicions will not invalidate an otherwise

proper inventory search.'" United States v. Sanchez, 720 F. App'x at 970 (quoting United States v. Cecala, 203 F.3d 836, 2000 WL 18948, at *2 (10th Cir. 2000)(Table)).

The Tenth Circuit has heard cases involving an inventory search of a criminal defendant's personal items following the Supreme Court's decision in Illinois v. Lafayette, 462 U.S. at 640.[6] for example, inn Petersen v. Farnsworth, 371 F.3d 1219 (10th Cir. 2004), a criminal defendant alleged violations of § 1983 in connection with his booking -- which included an inventory search -- at a county jail, before a hearing.  See 371 F.3d at 1220-21.  As part of booking the criminal defendant, the police "directed [the criminal defendant] into the jail intake area where [a police officer] performed a pat-down search of [the criminal defendant] and ordered him to remove his shoes, belt, wallet, watch, keys, glasses, pocket knife, and his outer shirt . . . .  His belongings were inventoried." Petersen v. Farnsworth, 371 F.3d 1221.  Relying on Illinois v. Lafayette, 462 U.S. at 640, the Tenth Circuit concludes that the inventory search was reasonable, because

> police had legitimate interests in verifying [the criminal defendant's] identity, ensuring that he did not bring any dangerous items into the jail, and making an inventory of the items taken from him during booking to deter theft of those items by jail personnel and to deter a false claim of theft.

---

[6]Although the Court has heard many cases involving searches of impounded vehicles, see, e.g., United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1345-51 (D.N.M. 2012) (Browning, J.); United States v. Kelly, No. CR 10-2057 JB, 2010 WL 5173599, at *12-20 (D.N.M. November 17, 2010)(Browning, J.)(unpublished); United States v. Jacquez, 409 F. Supp. 2d 1286, 1296-99 (D.N.M. 2005)(Browning, J.), aff'd, 284 F. App'x 544 (10th Cir. 2008), cases involving inventory searches of a criminal defendant's personal items, such as bags or containers, are less common.  There is at least one case from the United States District Court for the District of New Mexico that dealt with inventory searches of a defendant's personal belongings.  See Manygoat v. Prudencio, No. CIV 19-00347 RB/JFR, 2022 WL 1045649 (D.N.M. April 7, 2022)(Brack, J.) (unpublished).  In that case, the Court dismissed a pretrial detainee's claim for violations of the Fourth Amendment, noting that the detainee's allegations "show no more than that . . . officers conducted an inventory search in accordance with standardized procedures and established routines." No. CIV 19-00347 RB/JFR, 2022 WL 1045649, at *3 (citing Illinois v. Lafayette, 462 U.S. at 648; Florida v. Wells, 495 U.S. at 4-5).

Petersen v. Farnsworth, 371 F.3d at 1224.

In United States v. Battle, 188 F.3d 519, 1999 WL 596966 (10th Cir. 1999)(Table), as part of an arrestee's booking at a detention center, the police conducted an inventory search that involved taking the arrestee's personal items, including his clothing, airplane ticket, and keys.  See 188 F.3d at 519, 1999 WL 596966, at *5.  In ruling on a suppression motion related to an officer's testing the arrestee's keys on various locks after the inventory search, the Tenth Circuit noted a concession by counsel that "the initial taking of . . . [the arrestee's] personal items, i.e., clothing, airplane ticket and the keys, at the time he was incarcerated was an inventory search and non-violative of the Fourth Amendment."  188 F.3d at 519, 1999 WL 596966, at *5 (citing Illinois v. Lafayette, 462 U.S. at 646).

In United States v. O'Neil, 62 F.4th 1281 (10th Cir. 2023), a criminal defendant moved to suppress a gun that members of the University of New Mexico Police Department seized during a warrantless search of a backpack found in close proximity to the defendant following his arrest. See 62 F.4th at 1284-85.  The Honorable Judith C. Herrera, United States District Judge for the United States District Court for the District of New Mexico, did not suppress the gun on the grounds that the police inevitably would discover it during an inventory search conducted as a matter of procedure.  See United States v. O'Neil, 62 F.4th at 1286; United States v. O'Neil, No. CR 19-1832 JCH, 2021 WL 720455, at *7 (D.N.M. February 24, 2021)(Herrera, J.).  On appeal, the Tenth Circuit affirmed, concluding that police officer testimony regarding inventory search policies "suffices to show UNM police had a policy to take and inventory for safekeeping the possessions of anyone they arrest," and that, accordingly, "suppression was not warranted because the gun would have been inevitably discovered under the standard procedures used by UNM police," United States v. O'Neil, 62 F.4th at 1293.  While the Tenth Circuit accepted the officers'

testimony as proof of the existence of the inventory search policy, it noted that, "when the government seeks to demonstrate the existence of standardized procedures to establish the reasonableness of an inventory search under the Fourth Amendment, the better practice would be to introduce the written inventory procedures, if they are available." United States v. O'Neil, 62 F.4th at 1293 n.16.

## LAW REGARDING THE PLAIN-VIEW EXCEPTION

The Supreme Court has held that the Fourth Amendment's prohibition on unreasonable searches and seizures does not implicate what a person knowingly exposes to the public in plain view. See Katz v. United States, 389 U.S. 347, 351 (1967)("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."). Evidence which is recovered during "a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." Arizona v. Hicks, 480 U.S. 321, 328 (1987). Evidence or items of contraband discovered in plain view by an officer who is lawfully on the premises are thus admissible as evidence, regardless whether the officer was executing a valid search warrant. See Georgia v. Randolph, 547 U.S. 103, 137 (2006).

Importantly, the Tenth Circuit has held that, "when a container is '"not closed," or "transparent," or when its "distinctive configuration . . . proclaims its contents," the . . . contents can be said to be in plain view.'" United States v. Corral, 970 F.2d 719, 725 (10th Cir. 1992)(quoting United States v. Donnes, 947 F.2d 1430, 1436 (10th Cir. 1991))(citations omitted in United States v. Corral)(first omission in United States v. Corral). Additionally, "where the police already possess knowledge approaching certainty as to the contents of the container, the search of the container does not unreasonably infringe upon the individual interest in preserving

the privacy of those contents." <u>United States v. Corral</u>, 970 F.2d at 725-26.   The plain-view

exception applies if "'(1) the officer was lawfully in a position from which the object seized was

in plain view, (2) the object's incriminating character was immediately apparent . . . and (3) the

officer had a lawful right of access to the object.'" <u>Johnson</u>, 43 F.4th at 1110 (citing <u>United States</u>

<u>v. Angelos</u>, 433 F.3d 738, 747 (10th Cir. 2006)(quoting <u>United States v. Thomas</u>, 372 F.3d 1173,

1178 (10th Cir. 2004)(ellipsis in <u>Johnson</u>, but not <u>United States v. Angelos</u>, or <u>United States v.</u>

<u>Thomas</u>)).   "For an object's incriminating character to be immediately apparent, there must be

'probable cause to believe it [is] contraband or evidence of a crime.'" <u>Johnson</u>, 43 F.4th at 1110

(quoting <u>United States v. Angelos</u>, 433 F.3d at 747).   Regarding the distinction between

warrantless seizures and subsequent searches of items believed to contain illegal items, the Tenth

Circuit states:

> [A]lthough the plain-view exception "may support the warrantless *seizure* of a
> container believed to contain contraband," it does not automatically support a
> "subsequent *search* of the concealed contents of the container." *United States v.*
> *Corral*, 970 F.2d . . . [at] 725 . . . .   Rather, a subsequent search is only valid if "the
> contents of a seized container are a foregone conclusion" (or if the search is
> "accompanied by a warrant or justified by one of the exceptions to the warrant
> requirement"). *Id.*

<u>Johnson</u>, 43 F.4th at 1110.

## LAW REGARDING FOURTH AMENDMENT SEIZURES

When analyzing whether an encounter between police and citizens constitute a Fourth

Amendment seizure, courts divide these interactions into three categories: (i) consensual

encounters; (ii) investigative stops; and (iii) arrests.  See <u>Oliver v. Woods</u>, 209 F.3d 1179, 1186

(10th Cir. 2000).   "A police officer may seize someone either by physical force or a show of

authority." <u>United States v. Roberson</u>, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing <u>United States</u>

<u>v. Salazar</u>, 609 F.3d 1059, 1064 (10th Cir. 2010)).   "[W]hen an officer does not apply physical

force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064. The Court applies an objective standard to determine the existence of a show of authority. The Court asks "['']not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)); Florida v. Bostick, 501 U.S. 429, 434 (1991)("So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required" (internal citation and quotation marks omitted)). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064, but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. at 437 (quoting Mich. v. Chesternut, 486 U.S. 567, 569 (1988), and citing California v. Hodari D., 499 U.S. at 628).

### 1.   **Consensual Encounters.**

"Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." Oliver v. Woods, 209 F.3d at 1186. "'An encounter is consensual if the defendant "is free to leave at any time during the

encounter.'"'"  United States v. Esparza-Mendoza, 386 F.3d 953, 957 (10th Cir. 2004)(quoting United States v. Torres-Guevara, 147 F.3d 1261, 1264 (10th Cir. 1998)(quoting United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996))).  Thus, "[p]olice officers may approach citizens, ask them questions and ask to see identification without implicating the Fourth Amendment's prohibition against unreasonable searches and seizures."  United States v. Johnson, 364 F.3d 1185, 1188-89 (10th Cir. 2004).  "A person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way."  United States v. Esparza-Mendoza, 386 F.3d at 958.

   **2.    Investigative Detentions.**

   Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), "created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at 1557 (quoting Terry v. Ohio, 392 U.S. at 27)).  "An investigative detention, also called a Terry stop, is an encounter in which police may 'stop and briefly detain a person for investigative purposes.'"  Morris v. Noe, 672 F.3d 1185, 1191 (10th Cir. 2012)(quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).  A Terry stop is a Fourth Amendment seizure that does not require probable cause.  See Morris v. Noe, 672 F.3d at 1191 (quoting United States v. Sokolow, 490 U.S. at 7).  For a Terry stop to be justified, the officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' . . . ."  United States v. Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 30).  Additionally, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).  But a police-citizen encounter which goes

beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).

    **3.**     **Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[7]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-

---

[7]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning, J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").

53 (10th Cir. 1994).  See <u>Florida v. Royer</u>, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  <u>United States v. Rodriguez</u>, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).   See <u>Wilson v. Jara</u>, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011) (Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting <u>Oliver v. Woods</u>, 209 F.3d at 1185)), <u>aff'd</u>, 512 F. App'x 841 (10th Cir. 2013)(unpublished).   "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  <u>United States v. Valenzuela</u>, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting <u>United States v. Edwards</u>, 242 F.3d at 934, and citing <u>Draper v. United States</u>, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more than mere suspicion.'"  <u>United States v. Morris</u>, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting <u>United States v. Vazquez-Pulido</u>, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under <u>Terry v. Ohio</u>, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

<u>Alabama v. White</u>, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See <u>Beck v. Ohio</u>, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive." United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)(alterations in Olsen v. Layton Hills Mall but not in Romero v. Fay)).

## LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government generally will be prohibited from using that evidence in a criminal prosecution of that person.  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, *e.g.*, unconstitutional searches and seizures . . . and confessions exacted in violation of the right against compelled self-incrimination or due process . . . .")(citing Mapp v. Ohio, 367 U.S. 643, 655-57 (1961); Dickerson v. United States, 530 U.S. 428, 435 (2000)); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if a defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once a defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-

Castro, 470 F.3d at 999.  The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d at 1255.

1.      **Attenuation Doctrine.**

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." Utah v. Strieff, 579 U.S. at 238.  To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.  Brown v. Illinois, 422 U.S. at 603.  This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v. Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to

- 52 -

admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. See 468 U.S. at 799-800. They sought a warrant. See 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtained a search warrant. See 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 679 U.S. at 240 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, 579 U.S. at 239 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 579 U.S. at 241. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 579 U.S. at 241. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

**2.     Good-Faith Exception.**

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that, in certain contexts, evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith.  United States v. Davis, 564 U.S. 229, 236-37 (2011).  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule."  United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)).  The Supreme Court has explained that "[t]he basic insight of the Leon line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue."  United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)).  Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144).  By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'"  United States v. Davis, 564 U.S. at 238 (quoting United States v. Leon, 468 U.S. 908 n.6, and citing 468 U.S. at 909, 919; Herring v. United States, 555 U.S. at 137).

### a.    **Warrants Based on Illegally Obtained Information.**

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception."  United States v. Alabi, 943 F. Supp. 2d at 1260.  "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause

nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. [*United States v.*] *Cusumano*, 83 F.3d [1247,] 1250 [(10th Cir. 2005)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005). See United States v. Cusumano, 83 F.3d at 1250 ("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

###   b.   United States v. Leon.

In United States v. Leon, the Supreme Court confronts the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. See 468 U.S. at 905. The Supreme Court notes that excluding this evidence would not deter police misconduct. See 468 U.S. at 918-19. The officer at issue had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid. See 468 U.S. at 918-19. The Supreme Court explains that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly

deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court, thus, concludes

that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns

out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.

See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained

a warrant but the affidavit supporting the warrant does not establish probable cause, suppression

of the evidence found is generally not warranted, so long as the officers relied in good faith on the

warrant."    United States v. Martinez, 696  F. Supp. 2d  1216,  1244  (D.N.M.  2010)

(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States

v. Danhauer, 229 F.3d at 1007)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be
> ordered . . . only in those unusual cases in which exclusion will further the purposes
> of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . . "Where an
> officer acting with objective good faith obtains a search warrant from a detached
> and neutral magistrate and the executing officers act within its scope, there is
> nothing to deter."  United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that,

"[u]nder Leon, we presume good-faith when an officer acts pursuant to a warrant unless one of

'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard of the truth." [United States v.
> Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the
> "issuing magistrate wholly abandon[s her] judicial role." Id. Third, the good-faith
> exception does not apply when the affidavit in support of the warrant is "so lacking
> in indicia of probable cause as to render official belief in its existence entirely
> unreasonable." Id. (quotation omitted).  Fourth, the exception does not apply when
> a warrant is so facially deficient that the executing officer could not reasonably
> believe it was valid.  See id.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).
See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations
is present, the good-faith exception should not be applied, and the evidence should be excluded."
United States v. Romero, 743 F. Supp. 2d at 1316.

### c.      Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in
the Dale County, Alabama, warrant database. See 555 U.S. at 137. In the search incident to that
arrest, officers found drugs and a gun on Herring's person. See 555 U.S. at 137. Herring was then
indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turned out, however,
that the warrant under which the officers arrested Herring had been recalled, but the database the
arresting officers had relied on had not been updated to reflect that recall. See 555 U.S. at 138.
Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought
to suppress it. See 555 U.S. at 138. The district court denied Herring's motion to suppress, and
the United States Court of Appeals for the Eleventh circuit affirmed. See 555 U.S. at 138.

The Supreme Court affirms the Eleventh Circuit, a decision based primarily on the good-
faith exception to the exclusionary rule. See 555 U.S. at 140-46. The Supreme Court agrees with
the Eleventh Circuit that, although the police's failure to update the warrant database to reflect that
Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. See 555 U.S. at
140. The Supreme Court reiterates its holding in United States v. Leon: "When police act under a
warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police
acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring
v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). After tracing
the history of cases applying and declining to apply the exclusionary rule, the Supreme Court

distills a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. at 144. The Supreme Court further explains that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

### d.   Davis v. United States.

In Davis v. United States, the Supreme Court confronts the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest. See Arizona v. Gant, 556 U.S. at 341-48. The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996). Although the officers' search incident to the defendant's arrest "was in strict compliance with then-

binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant. United States v. Davis, 564 U.S. at 239-40.

On review, the Supreme Court determines that the "acknowledged absence of police culpability dooms [the defendant's] claim." United States v. Davis, 564 U.S. at 240. The Supreme Court explains that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144). The Supreme Court states: "The conduct of the officers here was neither of these things. The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement." United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144). The Supreme Court concludes that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." United States v. Davis, 564 U.S. at 240.

### 3. Inevitable-Discovery Exception.

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence

in question.  782 F.2d at 152.  Relying on this statement from United States v. Owens, the Court

states in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739

F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted

if an independent, lawful police investigation inevitably would have discovered it."  810 F. Supp.

2d at 1274 (citations and internal quotation marks omitted).  On appeal, however, the Tenth Circuit

clarified that the inevitable-discovery exception does not require an independent investigation that

would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540.

The Tenth Circuit explains:

> In *Cunningham* and [*United States v. Souza*, 223 F.3d 1197 (10th Cir. 2000),] we
> applied inevitable discovery to situations like the one here -- where there was "one
> line of investigation that would have led inevitably to the obtaining of a search
> warrant by independent lawful means but was halted prematurely by a search
> subsequently contended to be illegal."  *Cunningham*, 413 F.3d at 1204 n.1.  In
> *Cunningham*, police searched the defendant's home after getting his consent.  *Id.*
> at 1202.  The defendant later contested the search, claiming his consent was
> coerced.  *Id.*  We held that even if the search was illegal, the evidence was
> admissible because the officers "would have obtained a search warrant" if the
> search had not occurred.  *Id.* at 1205.  In *Souza*, police illegally opened a UPS
> package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence
> admissible under inevitable discovery because the officers "would have obtained a
> warrant" had the illegal search not occurred.  *Id.* at 1206.  Thus, our case law does
> not require a second investigation when the first (and only) investigation would
> inevitably have discovered the contested evidence by lawful means.
>
> . . . .
>
> Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery
> requires only that the lawful means of discovery be "independent of the
> constitutional violation," [*United States v.*] *Larsen*, 127 F.3d [984,] 987 [(10th Cir.
> 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

    In United States v. Souza, the Tenth Circuit "set[s] forth the standard for considering

whether the inevitable discovery doctrine applies to a warrantless search," United States v.

<u>Cunningham</u>, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," <u>United States v. Souza</u>, 223 F.3d at 1203. The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  <u>United States v. Souza</u>, 223 F.3d at 1205.  The Tenth Circuit adopts four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

<u>United States v. Souza</u>, 223 F.3d at 1204 (citations omitted)(quoting <u>United States v. Cabassa</u>, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).  Applying the first factor, the Tenth Circuit states:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case.  Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office.  Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

<u>United States v. Souza</u>, 223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit states:

> [A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong.  The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed.  Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

<u>United States v. Souza</u>, 223 F.3d at 1205-06.  The Tenth Circuit notes that a sergeant eventually obtained a search warrant.  <u>See</u> <u>United States v. Souza</u>, 223 F.3d at 1206.  Regarding the third

factor, the Tenth Circuit asserts that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  United States v. Souza, 223 F.3d at 1206.  The Tenth Circuit does not reach the fourth factor, but concludes that, although it is

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convinces [it] that [the case before it is] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasizes the "['']danger of admitting unlawfully obtained evidence "on the strength of some judge's speculation that it would have been discovered legally anyway"[']"  782 F.2d at 152-53 (quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)(quoting United States v. Castellana, 488 F.2d 65, 68 (5th Cir. 1974))). The Tenth Circuit considers whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  See United States v. Owens, 782 F.2d at 152-53. Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concludes:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the

powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153. "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In United States v. Cunningham, the Tenth Circuit "appl[ies] the inevitable discovery doctrine . . . because [it is] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered." 413 F.3d at 1205. The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- states:

> Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204. Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit explains:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the

following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05. Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit reasons: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit states:

There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. [*United States v. Souza*, 223 F.3d] at 1204. Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found. *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205. The Tenth Circuit, therefore, applies the inevitable-discovery doctrine. See 413 F.3d at 1205.

Similarly, in United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable-discovery exception applied. See 810 F. Supp. 2d at 1275-79. Regarding the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- the Court states: "The deputies did not

take any steps to obtain a warrant before entering Christy's residence.  The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence . . . .  This factor thus weighs against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275.  As to the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Court determines:

> The Court finds that Carvo had strong probable cause that Christy committed crimes.  At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.

> . . . .

> Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable."  These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse.  Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.

> Carvo also had strong probable cause for the federal crime of coercion or enticement.  Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

> . . . .

> Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement.  Because Carvo had strong probable cause for the California crime of unlawful

sexual intercourse and for the federal crime of enticement or coercion, this factor
weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted).  Regarding the third factor -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court reasons:

> The deputies "ultimately did obtain a warrant, albeit based in part on
> information retrieved" from Littlefield's actions of peering through a crack in the
> blinds in Christy's window, and from the deputies' entry into Christy's residence
> and subsequent interview of Christy.  *United States v. Cunningham*, 413 F.3d at
> 1205.  Although portions of the affidavits supporting the warrants were based on
> information the Court has found illegally obtained, the affidavits also included
> information from the California investigation.  Although the Tenth Circuit appears
> to rely on illegally obtained information in its inevitable discovery analysis, the
> Court does not believe that it can do so.  Carvo had strong probable cause that
> Christy committed California and federal crimes, and Carvo's probable cause was
> based on his investigation, and not on any information he learned from the BCSO
> or from the Albuquerque FBI . . . .  Because Carvo had strong probable cause for a
> California crime and a federal crime, based on information that he learned in his
> investigation, and not based on information he learned from the BCSO or from the
> Albuquerque FBI, Carvo would have obtained search warrants that were not based
> on illegally obtained information.  Based upon Carvo's belief that he had probable
> cause for both violations of California state law and violations of federal law, he
> would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant
> for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of
> that nature." . . . If the BCSO or Albuquerque FBI were not able to obtain a search
> warrant for these locations, Carvo would have written a federal search warrant
> himself and come to the District of New Mexico to seek the warrant with himself
> as the affiant . . . .  Carvo is cross designated to acquire both state and federal search
> warrants . . . .  This factor thus weighs in favor of application of the inevitable-
> discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1278-79 (second and third alterations in original).  As

to the fourth factor -- the existence of evidence that the officers jumped the gun, because they

lacked confidence in their showing of probable cause and wanted to force the issue by creating a

fait accompli -- the Court determines:

> There is "no evidence that the officers 'jumped the gun' due to a lack of
> confidence about probable cause and out of a desire to force the issue."  *United*

> *States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search
> occurred when it did because the deputies believed that they had exigent
> circumstances to enter Christy's residence.  This factor thus weighs in favor of
> application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applies the inevitable-

discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirms the Court's decision.  See 739 F.3d at 539-44.

Addressing the United States v. Souza factors, the Tenth Circuit notes that the defendant

challenged the Court's ruling only on factors two and four -- the strength of the probable cause

showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep

the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of

Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding

the second factor -- the strength of the showing of probable cause at the time the unlawful search

occurred -- the Tenth Circuit states:

> The district court found that Officer Carvo knew that K.Y. was a minor,
> there was a large age difference between her and Mr. Christy, the two exchanged
> sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y.
> Given those factual findings, it is a reasonable inference that a sexual relationship
> existed between Mr. Christy and K.Y.  Officer Carvo also knew that K.Y. was
> potentially suicidal, had left her depression medication behind, and ran away from
> home with Mr. Christy.  Based on that knowledge, Officer Carvo's belief that K.Y.
> was at risk for sexual victimization and assault was reasonable.  Thus, Officer
> Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity
> in violation of California law and coerced or enticed K.Y. to travel across state lines
> to engage in criminal sexual activity in violation of federal law.  *See Maryland v.
> Pringle*, 540 U.S. 336, 371 (2003).  The district court was correct in weighing this
> factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542.  Analyzing the fourth factor -- evidence that the officers

jumped the gun because they lacked confidence in their showing of probable cause and wanted to

force the issue by creating a fait accompli -- the Tenth Circuit explains:

Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. [*United States v.*] *Christy*, 810 F. Supp. 2d at 1279. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543. The Tenth Circuit concludes, therefore, that the Court properly applied the United States v. Souza factors. See United States v. Christy, 739 F.3d at 542.

## ANALYSIS

The Court denies the Suppression Motion and Supplemental Suppression Motion, and, therefore, declines to suppress the evidence resulting from Perry's interactions with Jackson on the Greyhound bus in Albuquerque on April 29, 2022. The Court's analysis proceeds in five steps. First, the Court concludes that Perry's interaction with Jackson on the Greyhound bus was a consensual encounter and not an illegal seizure. Second, the Court determines that Jackson conducted a self-search of his bags, which is not a Fourth Amendment search, without Perry inducing, tricking, or deceiving him. Third, the Court concludes that Perry had probable cause to arrest Jackson. Fourth, the Court concludes that Perry had probable cause to seize Jackson's bags. Fifth, the Court concludes that, although it was not a foregone conclusion on the basis of the self-searches of Jackson's bags that they contained illegal narcotics, the post-arrest search of Jackson's bags at the DEA office that revealed illegal narcotics was permissible as an inventory search. Accordingly, the Court denies the Suppression Motion and Supplemental Suppression Motion.

## I.    PERRY'S INTERACTION WITH JACKSON ON THE GREYHOUND BUS IS A CONSENSUAL ENCOUNTER.

As its first step in assessing the Suppression Motion, the Court determines that Perry's interaction with Jackson on the Greyhound bus before Jackson's arrest does not constitute a seizure under the Fourth Amendment, whether by physical force or a show of authority, because it was a consensual encounter.  See United States v. Roberson, 864 F.3d at 1121 (quoting United States v. Salazar, 609 F.3d at 1064 ("[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'")).  In determining whether the interaction was a Fourth Amendment seizure, the Court reviews the facts surrounding it to determine whether it was a consensual encounter, an investigative stop, or an arrest.  See Oliver v. Woods, 209 F.3d at 1186 (describing the three categories of interactions between police and citizens for purposes of determining whether a Fourth Amendment seizure occurred).  The Court's analysis proceeds in accordance with the Tenth Circuit's instruction that, "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized."  United States v. Ojeda-Ramos, 455 F.3d at 1183 (quoting United States v. Drayton, 536 U.S. at 201.  Accord Florida v. Bostick, 501 U.S. at 437 ("[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988))).

In determining whether a reasonable person would feel free to terminate a police encounter, the Tenth Circuit applies the following non-exhaustive list of factors:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers;

whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

United States v. Hernandez, 847 F.3d 1257, 1264 (10th Cir. 2017)(quoting United States v. Lopez, 443 F.3d 1280, 1284 (10th Cir. 2006)(quoting United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005))).  The Court analyzes each of these factors in turn.  The analysis leads the Court to conclude that, like the encounter in United States v. Drayton, here there was "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice,"  536 U.S. at 204, and, accordingly, a reasonable person would have felt free to terminate the encounter with Perry.

### A.   THE ENCOUNTER'S LOCATION AND CONTEXT SUPPORT A CONCLUSION THAT THE ENCOUNTER IS CONSENSUAL.

The Court begins its analysis by examining the encounter's location and context, and determines that this factor supports the conclusion that the encounter is consensual.  First, that the encounter took place in an enclosed space, i.e., a Greyhound bus, does not alone make the interaction rise to an illegal seizure.  See United States v. Drayton, 536 U.S. at 204 ("The fact that an encounter takes place on a bus does not on its own transform standard police questioning of citizens into an illegal seizure." (citing Florida v. Bostick, 501 U.S. at 439-40)).  As the Supreme Court notes in United States v. Drayton, on a bus, "because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances."  536 U.S. at 204.  Indeed, in this instance, that there were fifteen to twenty other passengers on the bus when Perry and

Zamarron boarded it, see Findings of Fact, supra ¶ 9, at 4 (citing December 20 Tr. at 12:1-6 (Cordova, Perry); id. at 68:22-24 (Meyers, Perry)), supports a conclusion that the encounter was consensual, see United States v. Drayton, 536 U.S. at 204.

For its location analysis, the Court looks not only to the search's location -- a Greyhound bus -- but also to the context of what was happening on the bus at the time of the encounter. Just before Perry's encounter with Jackson, Zamarron stood at the bus' front, behind the driver's seat, and not blocking the exit, see Findings of Fact, supra ¶ 8, at 4 (citing December 20 Tr. at 10:8-15 (Cordova, Perry)), and Perry commenced his interactions with passengers and approached a passenger named Osorio, see Findings of Fact, supra ¶ 10, at 4 (citing December 20 Tr. at 62:17-22 (Meyers, Perry); id. at 67:12-19 (Meyers, Perry)). Osorio sat across the aisle from Jackson. See Findings of Fact, supra ¶ 19, at 5 (citing December 20 Tr. at 11:6-13 (Cordova, Perry); id. at 60:10-21 (Meyers, Perry); id. at 67:5-19 (Meyers, Perry)). Given Jackson's close proximity to Osorio, Jackson witnessed Perry's interactions with Osorio, see Findings of Fact, supra ¶ 19, at 5 (quoting December 20 Tr. at 11:6-13 (Cordova, Perry); id. at 60:10-21 (Meyers, Perry); id. at 67:5-19 (Meyers, Perry)), including Perry showing Osorio his badge and asking him questions, see Findings of Fact, supra ¶ 10, at 4 (citing December 20 Tr. at 62:17-22 (Meyers, Perry); id. at 67:12-19 (Meyers, Perry)), Perry alerting Osorio that he was searching for "contraband," Findings of Fact, supra ¶ 12, at 5 (quoting December 20 Tr. at 70:14-17 (Meyers, Perry)), and, importantly, Osorio declining to give Perry consent to search his bags, see Findings of Fact, supra ¶ 14, at 5 (citing December 20 Tr. at 62:23-63:4 (Meyers, Perry)).

Jackson also witnessed Perry arrest Osorio moments before Perry's encounter with Jackson began. See Findings of Fact, supra ¶ 17, at 5 (citing December 20 Tr. At 60:10-17 (Meyers, Perry); id. at 63:16-23 (Meyers, Perry)). Jackson argues that witnessing Osorio's arrest -- a display of

police authority -- would make a reasonable person feel less able to terminate his interaction with

Perry, particularly in light of Perry's statement that "I'm a police officer, and we check the bus

here.  I'm sure you saw me."  Findings of Fact, supra ¶ 21, at 6 (citing April 29 Tr. at 2:2-4 (Perry);

December 20 Tr. at 15:8-11 (Cordova, Perry); id. at 16:2-5 (Cordova, Perry)).  See Supplemental

Suppression Motion at 16.  Indeed, Jackson maintains:

> Defendant was informed that he could not leave and was going to get
> searched no matter what when Agent Perry explained that "we check the bus here."
> Mr. Perry did not tell Mr. Jackson that he might check his belongings on the bus.
> He did not tell Mr. Jackson, that he would only check his items on the bus if Mr.
> Jackson permitted Mr. Perry to do so.  He did not tell Mr. Jackson that he was free
> to tell him that he could not check his items on the bus if Mr. Jackson didn't allow
> him to.  He also didn't tell Mr. Jackson that he was lying to him when he said he
> checks the bus, because the law doesn't allow him to check anything without the
> voluntary consent of the passenger.  He was further wrongfully detained when
> Agent Perry told him he could not move from where he was sitting: "Don't smash
> your strawberries here."  Although the encounter may ostensibly have had some of
> the makings of a consensual encounter, the DEA agent's actions and statements
> transformed it into a wrongful detention and then seizure.
>
> . . . .
>
> Mr. Perry lied to the defendant by saying that "we check the bus here."  This
> statement was formulated to inform the Defendant that he was not free to leave or
> deny permission to do as the agent pleased.  After telling Mr. Jackson that he checks
> the bus, he told him, "I'm sure you saw me."  This was told to Mr. Jackson in order
> to inform Mr. Jackson, that he had just arrested someone who initially denied
> consent to search his bag, and the same would happen to him

Supplemental Suppression Motion at 11-12, 16.

Analyzing the statements Perry made to Jackson in light of the Osorio interaction and

Perry's interactions on the bus more broadly, the Court concludes that Jackson's arguments are

unpersuasive.  First, the Court is unwilling to make the logical leap that the "we check the bus

here" informed Jackson that "he could not leave and was going to get searched no matter what."[8]

Supplemental Suppression Motion at 16. The Court is not convinced that Perry sought Jackson's

"cooperation with a government investigation by misrepresenting the nature of that investigation,"

United States v. Harrison, 639 F.3d 1273, 1278-79 (10th Cir. 2001), by "being vague and

inaccurate as to his purpose," as Jackson contends, Supplemental Suppression Motion at 16. "We

check the bus here" is a declarative statement, and the Court is not convinced that pairing it with

the vague "I'm sure you saw me," even in the immediate aftermath of Osorio's arrest, would serve

to order Jackson that he was not free to terminate the encounter, or indicate that, if Jackson did not

do as Perry told him, he would be arrested. First, the statement does not refer specifically to

Osorio's arrest; it also refers to Perry's questioning passengers in a general sense, particularly

given that it followed immediately the statement that "we check the bus here," Findings of Fact,

---

[8]In addition, the Court does not agree with the notion that "Perry lied" to Jackson "by saying 'we check the bus here.'" Supplemental Suppression Motion at 16. "We check the bus here" is a statement of fact which reflects what Perry was doing, i.e., questioning the bus' passengers about whether they were in possession of contraband. Findings of Fact, supra, ¶ 21, at 4 (citing April 29 Tr. at 2:2-4 (Perry); December 20 Tr. at 15:8-11 (Cordova, Perry); id. at 16:2-5 (Cordova, Perry)). See Findings of Fact, supra ¶ 12, at 5 (citing December 20 Tr. at 70:14-17 (Meyers, Perry)); Findings of Fact, supra, ¶ 40, at 9 (citing December 20 Tr. at 22:14-19 (Cordova, Perry); id. at 70:14-17 (Meyers, Perry); id. at 71:17-20 (Meyers, Perry); April 29 Tr. at 4:16-21 (Jackson, Perry)). That Perry did not lie to Jackson differentiates this case from Bumper v. North Carolina, 391 U.S. 543 (1968), which Jackson cites in his coercion argument. See Supplemental Suppression Motion at 16-17. In that case, the officers lied by saying they had a warrant to search a house, which led its occupant to let them in to conduct a search. See Bumper v. North Carolina, 391 U.S. at 546. Discussing the officers' lie, the Supreme Court states that, "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." 391 U.S. at 549. Unlike a police officer falsely claiming to have a warrant, Perry's saying "we check the bus here," would not indicate that Jackson was required to obey Perry's requests. In any event, there is no deception in Jackson's case akin to that in Bumper v. North Carolina, as Perry's statements reflected accurately what he was doing, i.e., checking the bus by questioning its passengers about whether they were in possession of contraband.

supra ¶ 21, at 6 (citing April 29 Tr. at 15:8-11 (Cordova, Perry); id. at 16:2-5 (Cordova, Perry),

and preceded the later statement that "[y]ou'll see me speaking with passengers on the bus,"[9]

Findings of Fact, supra ¶ 36, at 8 (quoting April 29 Tr. at 3:22-25 (Perry)).  Second, if Jackson

witnessed Osorio's arrest, he also witnessed Osorio's refusal of consent to search his bags.  See

Findings of Fact, supra ¶ 19, at 4 (citing December 20 Tr. at 11:6-13 (Cordova, Perry); id. at 60:10-

21 (Meyers, Perry); id. at 67:5-19 (Meyers, Perry)).  That Jackson witnessed another passenger

denying Perry consent to search his bags weighs in favor of a conclusion that a reasonable person

in Jackson's situation would feel free to terminate an encounter with Perry, particularly in the

context of a bus, where, "because many fellow passengers are present to witness officers' conduct,

a reasonable person may feel even more secure in his or her decision not to cooperate with police."

United States v. Drayton, 536 U.S. at 204.  Indeed, that Jackson told Perry "I don't give consent

to search my stuff," Findings of Fact, supra ¶ 48, at 10 (quoting April 29 Tr. at 4:22-23 (Jackson)),

indicates that he felt free to say no to Perry, in part because he saw Osorio refuse Perry's prior

request for a search.  Third, Perry's following the statements at issue with a question, "[m]ay I

speak to you for a moment?" is a question, not a command, and would suggest to a reasonable

person that he or she would not be required to speak to Perry, and could say no to his request.

---

[9]Perry's "[y]ou'll see me speaking with passengers on the bus" statement is similarly vague, and, if anything, it is less likely that it refers to the Osorio interaction and arrest than Perry's previous statement to Jackson did, because it uses the future, rather than past, tense.  Even if the statement did refer to the Osorio interaction and arrest, this statement, followed by the polite "[d]o you have any luggage on the bus with you today, sir?", can hardly be said to make a reasonable person believe that he or she was not free to terminate the encounter with Perry.  Indeed, just as the polite "[m]ay I speak to you for a moment" question followed Perry's earlier "we check the bus here" statement, see Findings of Fact, supra ¶ 21, at 6 (citing April 29 Tr. at 2:2-4 (Perry)), and neutralized its impact, here too the addition of "[d]o you have any luggage on the bus with you today, sir" serves to remove any hint of coercion from the "[y]ou'll see me speaking with passengers on the bus" statement, Findings of Fact, supra ¶ 36, at 8 (quoting April 29 Tr. at 3:22-25 (Perry)).

Findings of Fact, supra ¶ 21, at 6 (quoting April 29 Tr. at 2:2-4 (Perry)).  Further, that Jackson

responded "yeah" to Perry's request indicates Jackson's willing consent.  Findings of Fact, supra

¶ 22, at 6 (quoting December 20 Tr. at 15:17-16:1 (Cordova, Perry)).  Even if Jackson subjectively

believed Perry's statements to convey that he was not free to leave, the Tenth Circuit makes clear

that a defendant's "subjective state of mind . . . is wholly irrelevant and plays no role" in an

analyzing "whether a reasonable person would feel free to terminate an encounter with the police."

United States v. Abdenbi, 361 F.3d 1282, 1292 (10th Cir. 2004)(citing United States v. Little, 18

F.3d 1499, 1505 (10th Cir. 1994); United States v. Zapata, 997 F.2d 751, 757 (10th Cir. 1993)).

Accordingly, the Court concludes Perry's statements to Jackson, viewed in light of the Osorio

interaction, do not support a conclusion that Perry seized Jackson.[10]

---

[10]Also unpersuasive is Jackson's argument that Perry told him not to move when he said
""[d]on't smash your strawberries, here."  Findings of Fact, supra ¶ 55, at 11 (quoting April 29 Tr.
at 5:13-14 (Perry)).  The Court looks first to the context of this statement.  Perry asked Jackson to
show him his black duffle bag's contents.  See Findings of Fact, supra ¶ 53, at 10 (citing December
20 Tr. at 26:9-12 (Cordova, Perry); id. at 88:20-89:1 (Meyers, Perry); April 29 Tr. at 5:10-11
(Perry).  Jackson proceeded to hand Perry a partially-eaten strawberry before lifting his black
duffle bag from the floor, arising from his seat, and placing the black duffle bag on the empty
window seat next to him.  See Findings of Fact, supra ¶ 54, at 11 (citing December 20 Tr. at 26:13-
18 (Cordova, Perry); id. at 72:10-16 (Meyers, Perry); id. at 89:5-10 (Perry); id. at 107:12-18
(Cordova, Perry); April 29 Tr. at 5:13-16 (Perry)).  Then, Perry made the statement at issue, which
reads, in full: "Thank you, sir.  Don't smash your strawberries, here.  I'm going to put this back in
the -- put that back in there for you.  I didn't want to hold that.  Thank you, sir."  Findings of Fact,
supra ¶ 55, at 11 (quoting April 29 Tr. at 5:13-17 (Perry)).  Omitting the transcript's comma in
"don't smash your strawberries, here," Jackson argues that he was "further wrongfully detained
when Agent Perry told him he could not move from where he was sitting: 'Don't smash your
strawberries here.'"  Supplemental Suppression Motion at 11-12.  The Court understands the
"here" is demonstrative and intended to draw attention to Jackson's returning Perry's partially
eaten strawberry to him by placing it into a plastic container of strawberries partially underneath
Jackson's black duffle bag.  See Findings of Fact, supra ¶ 56, at 11 (citing December 20 Tr. at
72:17-21 (Meyers, Perry); id. at 90:11-19 (Meyers, Perry); id. at 91:16-23 (Meyers, Perry); April
29 Tr. at 5:13-17 (Perry)).  The Court finds unpersuasive the contention that "don't smash your
strawberries, here" is a statement intended to convey to Jackson that he was not free to move.
Findings of Fact, supra ¶ 55, at 1.  Indeed, the statement reads as a polite and courteous response
to Jackson's odd choice to hand Perry a partially-eaten strawberry as he positioned his black duffle

Further, Jackson contends that, on approaching Jackson, Perry was obligated to provide a series of disclosures, including, for example, that "he might check his belongings on the bus," that "he would only check his items on the bus if Mr. Jackson permitted Mr. Perry to do so," and that Perry "was lying . . . when he said he checks the bus, because the law doesn't allow him to check anything without the voluntary consent of the passenger."  Supplemental Suppression Motion at 16.  The Court credits the United States' citations to United States v. Drayton, 536 U.S. at 206, and United States v. Thompson, 546 F.3d 1223, 1228 (10th Cir. 2008), as support for its argument that Perry was not obligated to make the disclosures in question.  See Supplemental Response at 1-2.  Indeed, the Tenth Circuit notes that, in United States v. Drayton, "the Supreme Court expressly rejected the Eleventh Circuit's rule which made all police encounters non-consensual where officers failed to advise individuals of their right not to comply with their requests," and that the Tenth Circuit also rejects the need for such disclosures, including in United States v. Ringold, 335 F.3d at 1174.  United States v. Thompson, 546 F.3d at 1228.  As noted in United States v. Ringold, "the lack of notification of an individual's right to refuse consent may be a relevant fact to consider" in analyzing whether a police encounter was voluntary, but "'there is nothing unlawful about the practice of approaching individuals and asking them potentially incriminating questions, and there is no per se rule requiring law enforcement officials to specifically advise those individuals they do not have to answer police questions.'"  335 F.3d at

---

bag on the empty window seat next to him.  See Findings of Fact, supra ¶ 54, at 11 (citing December 20 Tr. at 26:13-18 (Cordova, Perry); id. at 72:10-16 (Meyers, Perry); id. at 89:5-10 (Perry); id. at 107:12-18 (Cordova, Perry); April 29 Tr. at 5:13-16 (Perry)).  In no way does Perry's statement regarding Jackson's strawberries contribute to a sense that Jackson would not be free to terminate the encounter with Perry or say no to his demands.  See United States v. Ojeda-Ramos, 455 F.3d at 1183 (quoting Florida v. Bostick, 501 U.S. at 436, and citing United States v. Drayton, 536 U.S. at 201).

1174 (quoting United States v. Broomfield, 201 F.3d 1270, 1275 (10th Cir. 2000)).  Accordingly, the Court does not agree with Jackson's disclosures argument.

The Court has considered the full context of Jackson's encounter with Perry, including the Perry-Osorio interaction's implications for Jackson's ability to terminate the encounter, as well as the statements Perry made to Jackson.  Witnessing Perry's encounter with Osorio, even when it led to Osorio's arrest, would not lead a reasonable person to the conclude that he would not be able to terminate his own subsequent encounter with Perry, particularly on a public bus. Accordingly, the Court proceeds on the understanding that the location and context of Perry's encounter with Jackson support a conclusion that the encounter was consensual.

**B.    PERRY AND ZAMARRON'S NOT TOUCHING OR RESTRAINING JACKSON SUPPORTS A CONCLUSION THAT THE ENCOUNTER    IS CONSENSUAL.**

Second, the Court looks to whether Perry and Zamarron "touch[ed] or physically restrain[ed]" Jackson.  United States v. Hernandez, 847 F.3d at 1264.  The Court notes that, because Zamarron stood at the bus' front, behind the driver's seat, and not blocking the exit, see Findings of Fact, supra ¶ 8, at 4 (citing December 20 Tr. at 10:8-15 (Cordova, Perry)), the analysis into touch or physical restraint concerns only Perry's conduct.  There is no evidence on the record that shows that Perry touched or restrained Jackson before his arrest.  See Findings of Fact, supra ¶ 72, at 13 (citing December 20 Tr. at 30:12-14 (Cordova, Perry)).  Similarly, there is no evidence that Perry blocked Jackson from the aisle and therefore from leaving the bus, as Perry stood just behind Jackson's seat, in the bus' aisle, with one foot partially behind his seat and the other foot partially in the aisle.  See Findings of Fact, supra ¶ 23, at 6 (citing December 20 Tr. at 11:14-17 (Cordova, Perry); id. at 83:2-10 (Meyers, Perry); id. at 83:25-84:3 (Perry)); Findings of Fact, supra ¶ 58, at 11 (citing December 20 Tr. at 91:7-10 (Perry)).  Just as Zamarron did not block the exit to

the bus, see Findings of Fact, supra ¶ 8, at 4 (citing December 20 Tr. at 10:8-15 (Cordova, Perry)),

Perry did not block Jackson's route to the aisle, see Findings of Fact, supra ¶ 23, at 6 (citing

December 20 Tr. at 11:14-17 (Cordova, Perry); id. at 83:2-10 (Meyers, Perry); id. at 83:25-84:3

(Perry)); Findings of Fact, supra ¶ 58, at 11 (citing December 20 Tr. at 91:7-10 (Perry)).

Accordingly, the Court concludes that Jackson was not only free from physical restraint, but also

free to leave the bus and terminate his encounter with Perry.

### C.   PERRY AND ZAMARRON'S PRESENTATION SUPPORTS A CONCLUSION THAT THE ENCOUNTER IS CONSENSUAL.

Third, the Court looks to how Perry and Zamarron presented themselves to Jackson,

specifically, whether they were in uniform or plain clothes, and whether they displayed their

weapons, as well as to "the number, demeanor and tone of voice of the officers." United States v.

Hernandez, 847 F.3d at 1264.  Both Perry and Zamarron were wearing plain clothes, without a

firearm, badge, or handcuffs visible, see Findings of Fact, supra ¶ 3, at 4 (citing December 20 Tr.

at 7:12-8:13 (Cordova, Perry); id. at 59:8-60:6 (Meyers, Perry)); Findings of Fact, supra ¶ 5, at 4

(citing December 20 Tr. at 9:8-21 (Cordova, Perry)), although Perry showed his DEA badge to

Jackson at the start of the encounter, see Findings of Fact, supra ¶ 21, at 6 (citing April 29 Tr. at

2:2-4; December 20 Tr. at 15:8-11 (Cordova, Perry); id. at 16:2-5 (Cordova, Perry)).  Before

arresting Jackson, Perry did not display his weapon, see Findings of Fact, supra ¶ 73, at 13 (citing

December 20 Tr. at 30:15-16 (Cordova, Perry)), or threaten Jackson, see Findings of Fact, supra

¶ 74, at 13 (citing December 20 Tr. at 30:17-18 (Cordova, Perry)).  As previously noted, although

there were two officers onboard the bus, at no point before Jackson's arrest did Zamarron interact

with Jackson.  See Findings of Fact, supra ¶ 75, at 13 (citing December 20 Tr. at 30:19-21

(Cordova, Perry)).  Further, Perry's word choice when addressing Jackson was consistently polite,

with Perry referring to Jackson consistently as "sir," Findings of Fact, supra ¶ 70, at 12-13 (quoting April 29 Tr. at 2:1 (Perry); id. 2:11 (Perry); id. at 2:24 (Perry); id. at 3:1 (Perry); id. at 3:22 (Perry); id. at 3:25 (Perry); id. at 4:21 (Perry); id. at 5:13 (Perry); id. at 5:25 (Perry); id. at 6:2 (Perry); id. at 6:7 (Perry)), and using the words "please," Findings of Fact, supra ¶ 71, at 13 (quoting April 29 Tr. at 2:16 (Perry); id. at 3:8 (Perry), and "thank you," April 29 Tr. at 3:1-2 (Perry); id. at 3:5 (Perry); id. at 3:18 (Perry); id. at 3:21 (Perry); id. at 5:13 (Perry); id. at 5:17 (Perry); id. at 5:25 (Perry)).   When Perry approached Jackson, he did not inform Jackson that he would be interrogating him and instead stated: "I'm a police officer, and we check the bus here.  I'm sure you saw me.  May I speak to you for a moment?"  Findings of Fact, supra ¶ 21, at 6 (quoting April 29 Tr. at 2:2-4 (Perry)).  As discussed in detail above, the Court finds unpersuasive Jackson's argument that the manner in which Perry introduced himself to Jackson indicates that Perry was not free to terminate the encounter or refuse consent.  See supra at 71-77.  Accordingly, The Court concludes that the manner in which Perry and Zamarron presented themselves to Jackson weighs in favor of a conclusion that the encounter between Perry and Jackson was consensual.

### D. THE LENGTH OF TIME PERRY RETAINED JACKSON'S PERSONAL EFFECTS SUPPORTS A CONCLUSION THAT THE ENCOUNTER   IS CONSENSUAL.

Fourth, the Court examines how long Perry retained Jackson's personal effects prior to his arrest.  See United States v. Hernandez, 847 F.3d at 1264.  Perry did not retain or otherwise manipulate Jackson's bags before his arrest.  See Findings of Fact, supra ¶ 20, at 5 (citing December 20 Tr. at 31:1-3 (Cordova, Perry); id. at 107:1-7 (Meyers, Perry)).  Perry asked Jackson, however, to show him his bus ticket, see Findings of Fact, supra ¶ 28, at 7 (citing December 20 Tr. at 16:25 (Perry); April 29 Tr. at 2:13-17 (Jackson, Perry)), and ID, see Findings of Fact, supra ¶ 30, at 7 (citing December 20 Tr. at 70:18-21 (Meyers, Perry); id. at 17:21 (Perry); April 29 Tr.

at 3:5-8 (Jackson, Perry)).  Jackson showed Perry his bus ticket on his cellular telephone.  See Findings of Fact, supra ¶ 29, at 7 (citing December 20 Tr. at 16:25-17:6 (Perry)).  Perry did not take possession of Jackson's cell phone while Jackson was showing him his bus ticket on it.  See Findings of Fact, supra ¶ 29, at 7 (citing December 20 Tr. at 17:7-10 (Cordova, Perry)).  Accordingly, the only relevant inquiry is into the length of time that Perry retained Jackson's ID.  Perry testifies that he reviewed Jackson's ID for "just a few seconds" before returning it to Jackson.  Findings of Fact, supra ¶ 33, at 8 (quoting December 20 Tr. at 20:19 (Perry)).  Given the very short time Perry possessed Jackson's ID -- the only property of Jackson that Perry held -- before Jackson's arrest, the Court concludes that this factor weighs in favor of the conclusion that the encounter between Perry and Jackson was consensual.

**E.    PERRY'S NOT SPECIFICALLY ADVISING JACKSON THAT THE ENCOUNTER WAS TERMINABLE DOES NOT SUPPORT A CONCLUSION THAT THE ENCOUNTER IS CONSENSUAL.**

Fifth, the Court looks to whether Perry "specifically advised [Jackson] at any time that he had the right to terminate the encounter or refuse consent."  United States v. Hernandez, 847 F.3d at 1264.  There is no evidence on the record that suggests that Perry ever explicitly told Jackson that Jackson could cease the encounter, whether by ending his conversation with Perry or leaving the bus.  Further, Perry did not inform Jackson that Jackson could refuse the search until after Jackson refused consent.  See Findings of Fact, supra ¶ 49, at 10 (citing December 20 Tr. at 24:3-13 (Cordova, Perry); id. at 70:2-7 (Perry); id. at 74:5-9 (Meyers, Perry); April 29 Tr. at 4:24-25 (Perry)).  While Perry's not disclosing to Jackson that the encounter was terminable does not, by itself, make the encounter non-consensual, see United States v. Thompson, 546 F.3d at 1228, it is the sole United States v. Hernandez factor which supports a conclusion that the encounter between Perry and Jackson was non-consensual, see 847 F.3d at 1264.

All but one of the factors enumerated in United States v. Hernandez, 847 F. 3d at 1264, suggest that the encounter between Perry and Jackson was consensual, and that a reasonable person would have felt free to terminate it, see United States v. Ojeda-Ramos, 455 F.3d at 1183 (quoting United States v. Drayton, 536 U.S. at 201).  The totality of the circumstances indicates that the Jackson and Perry's initial interaction is neither an investigative stop nor an arrest, and is instead a consensual encounter.  See Oliver v. Woods, 209 F.3d at 1186 (describing the three categories of interactions between police and citizens for purposes of determining whether a Fourth Amendment seizure occurred).  The Court concludes that, as in United States v. Drayton, here there was "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."  536 U.S. at 204.  Accordingly, the Court concludes that the interaction is a consensual encounter.

## II.    JACKSON WILLINGLY SHOWED PERRY HIS BAGS' CONTENTS THROUGH A SELF-SEARCH -- WHICH IS NOT A SEARCH FOR FOURTH AMENDMENT PURPOSES -- WITHOUT PERRY INDUCING, TRICKING, OR DECEIVING HIM.

Having concluded that Jackson's encounter with Perry was consensual, the Court now the circumstances surrounding Jackson's self-search of his bags and concludes that Jackson conducted the self-search consensually, without Perry inducing, tricking, or deceiving Jackson into showing him the bag's contents.  The Court first determines that Jackson's self-searches of his bags do not constitute Fourth Amendment searches.  The Court then concludes that, even if the self-searches were Fourth Amendment searches, they were consensual, and, therefore, would not require a warrant.  See Schneckloth v. Bustamonte, 412 U.S. at 219.

A.   **JACKSON'S SELF-SEARCHES OF HIS BAGS ARE NOT SEARCHES FOR FOURTH AMENDMENT PURPOSES.**

As an initial matter, the Court notes that, for Fourth Amendment purposes, Perry did not conduct a search when Jackson showed him the contents of his bags, see Findings of Fact, supra ¶ 42, at 9 (citing December 20 Tr. at 22:20-24 (Cordova, Perry); id. at 23:9-10 (Perry); id. at 23:15-16 (Perry); id. at 86:24-87:7 (Meyers, Perry); id. at 88:11-19 (Meyers, Perry)); Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)), particularly given that Perry did not touch the bags or direct Jackson to go slower or show him particular items in the bag, see Findings of Fact, supra ¶ 44, at 9 (citing December 20 Tr. at 87:8-10 (Meyers, Perry)); Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)).  Instead,  Perry's examination of Jackson's bags' contents is best characterized as a "self-search," United States v. Johnson, 428 F. Supp. 3d 655, 674 (D.N.M. 2019)(Browning, J.), aff'd in part, rev'd in part, and remanded, 43 F.4th 1100 (10th Cir. 2022), in which Jackson willingly exposed the contents of his own bags to avoid having Perry search them, which resulted in Perry seeing items that Jackson placed in plain view by opening the bags, see Findings of Fact, supra ¶ 44, at 9 (citing December 20 Tr. at 87:8-10 (Meyers, Perry)); Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)).  In United States v. Johnson, another case involving Perry, the Court confronted a similar situation in which a passenger displayed his bag's contents to Perry and accepted Perry's characterization of the revealing of the bag's contents as a "self-search."[11]  428 F. Supp. 3d at 674.  The Tenth Circuit

---

[11]In United States v. Johnson, "Perry testified that, in his experience, individuals will conduct a 'self-search' to attempt to conceal contraband while deflecting law enforcement's concerns."  428 F. Supp. 3d at 674.

in Johnson does not disturb the Court's finding in that case that "[o]nly after the arrest did Perry touch or search Johnson's bag," United States v. Johnson, 428 F. Supp. 3d at 663, and provides no indication that the Tenth Circuit considers the "self-search" to be a search for Fourth Amendment purposes, see Johnson, 43 F.4th at 1109 (discussing the "self-search" and affirming the Court's conclusion that the self-search supports probable cause).[12]  As the Supreme Court stated in Arizona v. Hicks, "a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion."  480 U.S. at 328.  See United States v. Most, 876 F.2d 191, 193 (D.C. Cir. 1989)("Not every investigative technique constitutes a 'search' triggering the protections of the fourth amendment.  For example, a police officer does not perform a 'search' when he examines objects which are already in 'plain view.'").  Accordingly, the Court concludes that Jackson's self-searches by which he revealed his bags' contents to Perry do not constitute searches for Fourth Amendment purposes.

First, the Court examines the self-search of the white Dolce & Gabbana bag.  At the start of the encounter, Perry asked Jackson if Jackson would "voluntarily consent for a search of the bag you have with you for contraband."  Findings of Fact, supra ¶ 40, at 9 (quoting April 29 Tr. at 4:12-14 (Perry)).  See Findings of Fact, supra ¶ 40, at 9 (citing December 20 Tr. at 22:14-19 (Cordova, Perry); id. at 70:14-17 (Meyers, Perry); id. at 71:17-20 (Meyers, Perry); April 29 Tr. at

---

[12]The Tenth Circuit concluded that two warrantless searches occurred in Johnson, the first being "Perry's 'probing tactile examination' of the bundle following Johnson's arrest," and the second being the subsequent search at the DEA office.  43 F.4th at 1112 (quoting United States v. Bond, 529 U.S. at 337-39), 1114-15.  While a warrantless, post-arrest search of Jackson's bags at the DEA office occurred in this case, see Findings of Fact, supra ¶ 81, at 14 (citing December 20 Tr. at 32:6-17 (Cordova, Perry); id. at 105:13-106:1 (Meyers, Perry)), there is no evidence that Perry conducted a "'probing tactile examination,'" following Jackson's self-search and arrest, as occurred in Johnson, 43 F.4th at 1112 (quoting United States v. Bond, 529 U.S. at 337-39)).

4:16-21 (Jackson, Perry)).  Jackson did not answer whether he would permit Perry to search his

white Dolce & Gabbana bag, see Findings of Fact, supra ¶ 41, at 9 (citing December 20 Tr. at 23:8-

9 (Perry); April 29 Tr. at 4:12-17 (Jackson, Perry)), and proceeded to show Perry the bag's contents

by opening the bag and moving his hands quickly around the bag's inside, see Findings of Fact,

supra ¶ 42, at 9 (citing December 20 Tr. at 22:20-24 (Cordova, Perry); id. at 23:9-10 (Perry); id.

at 23:15-16 (Perry); id. at 86:24-87:7 (Meyers, Perry); id. at 88:11-19 (Meyers, Perry)).  When

Jackson was moving his hands around the inside of the white Dolce & Gabbana bag, Perry did not

tell him to go slower or show him particular items in the bag.  See Findings of Fact, supra ¶ 44, at

9 (citing December 20 Tr. at 87:8-10 (Meyers, Perry)).  After Jackson revealed the white Dolce &

Gabbana shopping bag's contents, Perry asked again if Jackson would permit him to search the

bag for contraband, see Findings of Fact, supra ¶ 46, at 10 (citing December 20 Tr. at 23:3-5

(Cordova, Perry); id. at 23:23-25 (Perry); April 29 Tr. at 4:17-21 (Perry)), and, this time, Jackson

denied having contraband and said: "I don't give consent to search my stuff," Findings of Fact,

supra ¶ 48, at 10 (quoting April 29 Tr. at 4:22-23 (Jackson)).  See Findings of Fact, supra ¶ 48, at

10 (citing December 20 Tr. at 23:25-24:2 (Perry); id. at 70:1-2 (Perry); id. at 74:14-17 (Meyers,

Perry)).  After Jackson denied Perry consent to search his belongings, Perry told Jackson it was

his right to refuse the search.  See Findings of Fact, supra ¶ 49, at 10 (citing December 20 Tr. at

24:3-13 (Cordova, Perry); id. at 70:2-3 (Perry); id. at 74:5-9 (Meyers, Perry); April 29 Tr. at 4:24-

25 (Perry)).

    In order to avoid having Perry search his white Dolce & Gabbana shopping bag, Jackson

conducted a brief self-search by opening the bag and moving his hands quickly around the bag's

inside, see Findings of Fact, supra ¶ 42, at 9 (citing December 20 Tr. at 22:20-24 (Cordova, Perry);

id. at 23:9-10 (Perry); id. at 23:15-16 (Perry); id. at 86:24-87:7 (Meyers, Perry); id. at 88:11-19

(Meyers, Perry)), with Perry making no contact with the bag or its contents, or even directing Jackson as he manipulated the contents, see Findings of Fact, supra ¶ 44, at 9 (citing December 20 Tr. at 87:8-10 (Meyers, Perry)).  Perry asked if he could search the bag, but Jackson said that he could not.  See Findings of Fact, supra ¶ 48, at 10 (citing April 29 Tr. at 4:22-23 (Jackson)).  The Court determines that, for the white Dolce & Gabbana shopping bag, rather than allowing Perry to search the bag, Jackson willfully revealed its contents to him through a self-search.  See Findings of Fact, supra ¶ 42, at 9 (citing December 20 Tr. at 22:20-24 (Cordova, Perry); id. at 23:9-10 (Perry); id. at 23:15-16 (Perry); id. at 86:24-87:7 (Meyers, Perry); id. at 88:11-19 (Meyers, Perry)).  The result was a "cursory inspection" of the kind in Arizona v. Hicks, because Perry, who did not touch the bag or its contents, "merely look[ed] at what [wa]s already exposed to view" after Jackson opened the bag.  480 U.S. at 328.  Accordingly, the self-search therefore was "not a 'search' for Fourth Amendment purposes."  480 U.S. at 328.

The Court makes the same determination regarding Jackson's self-search of his black duffle bag, which immediately preceded his arrest.  See Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)).  A review of the relevant facts indicates that Perry asked Jackson to show him the duffle bag's contents, see Findings of Fact, supra ¶ 53, at 10 (citing December 20 Tr. at 26:9-12 (Cordova, Perry); id. at 88:20-89:1 (Meyers, Perry); April 29 Tr. at 5:10-11 (Perry)), and Jackson opened the bag and began to move quickly the items inside the bag, see Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)).  It bears noting that Jackson's opening the black duffle bag occurred after he refused to give Perry permission to search his "stuff," which would include the black duffle bag.  Findings of Fact, supra ¶ 48, at 10 (quoting April 29 Tr. at 4:22-23 (Jackson)).  See Findings of Fact, supra ¶ 48, at 10 (citing December 20 Tr. at 23:25-24:2 (Perry); id. at 70:1-

2 (Perry); id. at 74:14-17 (Meyers, Perry)).  Once again, it appears that Jackson attempted to satisfy Perry through a self-search by quickly rummaging through his own bag, see Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)), and telling him "[i]t's just got clothes in here," Findings of Fact, supra ¶ 60, at 11 (quoting April 29 Tr. at 5:18 (Jackson)).  Although Perry asked Jackson, "[w]hat's inside of the clothes?" Findings of Fact, supra ¶ 61, at 11 (quoting April 29 Tr. at 5:22-23 (Perry)); see Findings of Fact, supra ¶ 61, at 11 (citing December 20 Tr. at 28:23-24 (Cordova, Perry); id. at 102:4-9 (Meyers, Perry)), and Jackson responded, "nothing," Findings of Fact, supra ¶ 62, at 12 (quoting April 29 Tr. at 5:24 (Jackson); see December 20 Tr. at 28:25-29:3 (Cordova, Perry); id. at 102:8-11 (Meyers, Perry)), as with the white Dolce & Gabbana shopping bag, there is no evidence on the record to indicate that Perry made contact with the bags or their contents, or directed Jackson how to reveal its contents to him. That Jackson told Perry that there was nothing inside the clothes in the duffle bag, see Findings of Fact, supra ¶ 62, at 12 (quoting April 29 Tr. at 5:24 (Jackson); see December 20 Tr. at 28:25-29:3 (Cordova, Perry); id. at 102:8-11 (Meyers, Perry)), without opening up the clothes so Perry could see inside them, indicates that Jackson felt free to limit what items came into Perry's plain view, and supports the conclusion that the self-search was voluntary and conducted on Jackson's own terms.  See Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)).  The Court concludes that at no point on the bus did Perry conduct a Fourth Amendment search of Jackson's bags.

### B.   EVEN IF JACKSON'S SELF-SEARCHES WERE FOURTH AMENDMENT SEARCHES, WHICH THEY ARE NOT, THEY WERE CONSENSUAL AND WOULD NOT REQUIRE A WARRANT.

Even if the self-searches constituted searches for the Fourth Amendment's purposes, which they do not, they were consensual, because Perry did not induce, trick, or deceive Jackson into

revealing his bags' contents, and Jackson "'freely and voluntarily'" showed Perry his bags'

contents. United States v. Peña, 143 F.3d at 1366 (quoting Schneckloth v. Bustamonte, 412 U.S.

at 222 (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968))). The Court applies the

Tenth Circuit's two-part test for determining voluntariness, which requires that: (i) the government

"'proffer clear and positive testimony that consent was unequivocal and specific and intelligently

given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'" United

States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878). The

Court's analysis analyzes the two prongs of the Tenth Circuit's test in turn.

First, the Court concludes that the United States meets its burden in proving that "['']consent

was unequivocal and specific and intelligently given.'" United States v. Sanchez, 608 F.3d at 690

(quoting United States v. Taverna, 348 F.3d at 878). Assuming for a moment that Jackson's self-

searches constituted searches under the Fourth Amendment -- which they do not -- Jackson's

acquiescence to them was non-verbal, and expressed consent through his opening his bags and

showing Perry their contents, which satisfies the voluntariness test's first prong.[13] See United

States v. Guerrero, 472 F.3d at 789-90 ("To satisfy the first prong of the voluntariness requirement,

a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted

through gestures or other indications of acquiescence, so long as they are sufficiently

comprehensible to a reasonable officer."); Ysasi v. Brown, 3 F. Supp. 3d at 1143 (noting that

consent "need not be spoken, but 'may instead be granted through gestures or other indications of

---

[13]In addition, Jackson consented verbally to Perry's initial request to speak to him, when he responded "yeah," Findings of Fact supra, ¶ 22, at 6 (quoting December 20 Tr. at 15:17-16:1 (Cordova, Perry)), to Perry's initial statement that "I'm a police officer, and we check the bus here. I'm sure you saw me. May I speak to you for a moment?" Findings of Fact supra, ¶ 21, at 6 (citing April 29 Tr. at 2:2-4 (Perry); December 20 Tr. at 15:8-11 (Cordova, Perry); id. at 16:2-5 (Cordova, Perry)).

acquiescence'" (quoting United States v. Guerrero, 472 F.3d at 789-790)).   Accordingly, the

Court's analysis proceeds to the second prong of the Tenth Circuit's voluntariness test.

On the second prong, the Court concludes that Perry used no "'implied or express duress

or coercion.'"   United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348

F.3d at 878).   As to the voluntariness test's second prong, the factors the Tenth Circuit uses to

determine whether a defendant's consent to a search was voluntarily given are substantively nearly

identical to the factors the Tenth Circuit uses to determine whether a defendant's encounter with

the police was consensual.  Compare United States v. Sedillo, 2010 WL 965743, at *19 (describing

the Tenth Circuit's "non-exhaustive factors to consider when determining whether a defendant's

consent to search was voluntary"), with United States v. Hernandez, 847 F.3d at 1264 (describing

the Tenth Circuit's factors for "determining whether a reasonable person would feel free to

terminate his encounter with the police").   In addition, the Tenth Circuit directs courts to consider

whether there is evidence of "physical mistreatment, use of violence, threats, threats of violence,

promises or inducements, deception or trickery," United States v. McCurdy, 40 F.3d at 1119,  none

of which are present here, see Findings of Fact, supra ¶ 72, at 13 (citing December 20 Tr. at 30:12-

14 (Cordova, Perry)); Findings of Fact, supra ¶ 73, at 13 (citing December 20 Tr. at 30:15-16

(Cordova, Perry)); Findings of Fact, supra ¶ 74, at 13 (citing December 20 Tr. at 30:17-18

(Cordova, Perry)).[14]  The Tenth circuit also directs the courts to consider "the physical and mental

condition and capacity of the defendant within the totality of the circumstances," neither of which

the Court has no reason to question in Jackson's case.   United States v. McCurdy, 40 F.3d at 1119.

---

[14]As discussed in the analysis of whether Jackson's encounter with Perry was consensual,
the Court finds unconvincing Jackson's arguments that Perry induced, tricked, or deceived him.
See supra at 68-77.

Accordingly, applying its analysis of whether Jackson's encounter with Perry was consensual, see supra at 68-81, the Court concludes that, if the self-searches were Fourth Amendment searches, Jackson gave his consent to them freely and voluntarily.  See United States v. Zapata, 997 F.2d at 756 ("[P]olice may freely ask question of any individual they choose, including requesting to see identification and requesting consent to search the individual's luggage, 'so long as the officers do not convey a message that compliance with their requests is required.'" (quoting Florida v. Bostick, 501 U.S. at 437, and citing United States v. Bloom, 975 F.2d 1447, 1451-52 (10th Cir. 1992))). The Court makes this conclusion with specific reference to its analysis of the statements Perry made that Jackson characterizes as "acts of inducement, trickery and deception," in addition to the other relevant factors.  Supplemental Suppression Motion at 16.  Accordingly, the Court concludes that, even if Jackson's self-searches were searches for the Fourth Amendment's purposes -- which, as self-searches, they were not, see supra at 81-86 -- they were not the product of inducement, trickery, or deception, but instead the result of Jackson's voluntary consent.

### III.   BASED ON JACKSON'S STATEMENTS, CONDUCT, AND ITEMS VISIBLE IN JACKSON'S BLACK DUFFLE BAG DURING THE SELF-SEARCH, PERRY HAD PROBABLE CAUSE TO ARREST JACKSON.

As the next step in its Fourth Amendment analysis, the Court determines that Perry had probable cause to conduct a warrantless arrest of Jackson.  See Oliver v. Woods, 209 F.3d at 1186 (stating that an arrest is appropriate if an "officer has probable cause to believe a crime has been committed by the arrestee").  In this instance, Jackson's consensual encounter with Perry, during which Perry questioned Jackson and saw the contents of Jackson's bags, escalated into a warrantless arrest.  See United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)(noting that the categories of police-citizen encounters are "not static" and that "[a] consensual encounter may escalate into an investigative detention," and "[a]n investigative detention may escalate into a full-

blown arrest").  Accordingly, the Court's inquiry is whether Perry was right to escalate the consensual encounter into a warrantless arrest based on probable cause.  See United States v. Shareef, 100 F.3d at 1500 ("A reviewing court must analyze each stage of the encounter, ensuring that the requisite level of suspicion or cause is present at each stage.").  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Romero v. Fay, 45 F.3d at 1476 (quoting Jones v. City & Cty. of Denver, Colo., 854 F.2d 1206, 1210 (10th Cir. 1988)).  Accordingly, the Court looks to whether the facts and circumstances within Perry's knowledge at the time he arrested Jackson support a finding of probable cause, noting that, as the Tenth Circuit has stated, "[p]robable cause does not require facts sufficient for a finding of guilt; however, it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)(citing United States v. Hansen, 652 F.2d 1374, 1388 (10th Cir. 1981))).

To determine whether Perry had probable cause to arrest Jackson, the Court reviews the facts and circumstances that became apparent to Perry that led him to escalate the encounter from a consensual encounter to an arrest.  Romero v. Fay, 45 F.3d at 1476 (quoting Jones v. City & Cnty. of Denver, Colo., 854 F.2d at 1210).  First, the Court considers that Perry discovered, based on Jackson's responses to his questions and a comparison of Jackson's bus ticket and ID, that Jackson was traveling under a name which is not his own and to and from places where he did not live.  After Perry asked Jackson where he was traveling, see Findings of Fact, supra ¶ 26, at 6 (citing April 29 Tr. at 2:11 (Perry)), Jackson told Perry he was traveling from Perris, California, to Oklahoma, see Findings of Fact, supra ¶ 27, at 7 (citing December 20 Tr. at 16:8-20 (Cordova,

Perry); April 29 Tr. at 2:11-22 (Jackson, Perry); id. at 3:9-11 (Jackson, Perry)).  When asked to provide his bus ticket to Perry, see Findings of Fact, supra ¶ 28, at 7 (citing December 20 Tr. at 16:25 (Perry); April 29 Tr. at 2:13-17 (Jackson, Perry)), Jackson provided a bus ticket listing the name "Rashad Mitchell," see Findings of Fact, supra ¶ 29, at 7 (citing December 20 Tr. at 16:21-17:6 (Cordova, Perry); April 29 Tr. at 3:3-4 (Jackson, Perry)).  When Perry asked Jackson to provide his ID, see Findings of Fact, supra ¶ 30, at 7 (citing December 20 Tr. at 70:18-21 (Meyers, Perry); id. at 17:21 (Perry); April 29 Tr. at 3:5-8 (Jackson, Perry)), Jackson handed Perry an identification card with a Georgia address, listing a June 2, 1979, date of birth, and the name Glen A. Jackson, Jr., see Findings of Fact, supra ¶ 31, at 7 (citing December 20 Tr. at 70:22-71:16 (Meyers, Perry); id. at 19:11-16 (Cordova, Perry); Jackson ID).  The relevant question is whether these facts would "lead a prudent person to believe" that Perry "has committed or is committing an offense."  Romero v. Fay, 45 F.3d at 1476 (quoting Jones v. City & Cty. Of Denver, Colo., 854 F.2d at 1210).

Jackson argues that the facts Perry alleges in support of probable cause are "innocuous" and that they are consistent with innocent behavior.  Supplemental Suppression Motion at 20. There may, theoretically, be innocent explanations for a person to travel under a name which is not his own on a journey neither to nor from his residence.  Jackson provides the examples of a person using a ticket that somebody else purchased in his or her name and a person who has split his or her journey into multiple legs.  See Supplemental Suppression Motion at 20-21.  Rife v. Okla. Dep't of Public Safety, 854 F.3d 637 (10th Cir. 2017), however, makes clear that "probable cause does not require police officers to rule out all innocent explanations for a suspect's behavior."  854 F.3d at 644-45 (citing Lingo v. City of Salem, 832 F.3d 953 (9th Cir. 2016); United States v. Reed, 220 F.3d 476, 478 (6th Cir. 2000); United States v. Fama, 758 F.2d 834, 838 (2d

Cir. 1985)).  The Court credits the United States' citation to Illinois v. Gates for the proposition

that "innocent behavior frequently will provide the basis for a showing of probable cause."  462

U.S. at 245 n.13.  Just because it is a theoretical possibility that there was an innocent explanation

for Jackson traveling under another name on a journey neither to nor from his home, those facts

could still "lead a prudent person to believe" that Perry "has committed or is committing an

offense."  Romero v. Fay, 45 F.3d at 1476 (quoting Jones v. City & Cnty. Of Denver, Colo., 854

F.2d at 1210).

    Indeed, in Johnson, another case involving Perry, the Tenth Circuit rejected a similar

innocent-explanation argument about a defendant's actions that, in the Court's assessment, were

similarly suspicious to Jackson's in this case.  See Johnson, 43 F.4th at 1107-08.  In that case, the

action at issue involved a defendant placing a backpack under the seat next to him and neglecting

to produce identification.  See Johnson, 43 F.4th at 1107.  Even though passengers not engaged in

criminal activity sometimes place backpacks under neighboring seats and forget their IDs, the

Tenth Circuit emphasized that "[t]he pertinent question 'is not whether the particular conduct is

'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non[]criminal

acts.'"  Johnson, 43 F.4th at 1108 (quoting Illinois v. Gates, 462 U.S. at 243 n.13 (second alteration

in Johnson, but not in Illinois v. Gates)).  The Tenth Circuit accordingly rejected the argument that

the backpack's placement and the defendant's inability to produce identification did not contribute

to probable cause.  See Johnson, 43 F.4th at 1108.

    Applying these cases to the present facts, the Court concludes that Perry's discovery that

Jackson was traveling under another name on a journey neither to nor from his home address

contributes to probable cause for arresting Jackson.  A discovery that a passenger is traveling under

a name which is not his own could "lead a prudent person to believe" that the passenger "has

committed or is committing an offense." Romero v. Fay, 45 F.3d at 1476 (quoting Jones v. City & Cnty. Of Denver, Colo., 854 F.2d at 1210). The Court believes traveling under another name to be similarly suspicious to placing a bag under a neighboring seat and not providing identification, as occurred in Johnson. 43 F.4th at 1107-08. Further, the Tenth Circuit in United States v. Gordon concludes that "traveling under another name" can contribute to probable cause. 173 F.3d at 767. Accordingly, the Court concludes that Jackson's traveling under a name which is not his own contributes to a finding of probable cause.

Although perhaps less suspicious than traveling under a name which is not his own, Jackson's announcing that he was traveling from Perris, California, to Oklahoma, see Findings of Fact, supra ¶ 27, at 7 (citing December 20 Tr. at 16:8-20 (Cordova, Perry); April 29 Tr. at 2:11-22 (Jackson, Perry); id. at 3:9-11 (Jackson, Perry)), neither of which is his home address, see Jackson ID (listing a Georgia address), also suggests criminal activity. Indeed, Perry asserts that, in his experience as a DEA agent, it is common to see individuals delivering illegal narcotics to be traveling to a destination that does not correspond to their home address. See Findings of Fact, supra ¶ 34, at 8 (citing December 20 Tr. at 20:7-13 (Cordova, Perry)). The Court concludes that Jackson's traveling neither to nor from his home address contributes to a finding of probable cause, which finds further support in his also traveling under a name which is not his own.

Next, the Court examines Jackson's decision not to identify all of his luggage when Perry first approached him. When Perry initially asked Jackson whether he was traveling with luggage, Jackson told Perry that he had luggage in the cargo hold and reached down to identify the white Dolce & Gabbana shopping bag as his own, but not the black duffle bag. See Findings of Fact, supra ¶ 37, at 8 (citing December 20 Tr. at 20:24-21:9 (Cordova, Perry); April 29 Tr. at 4:1-8 (Jackson, Perry); Blue Duffle Bag Photo). When Perry followed up his question by asking whether

Jackson had any additional luggage in the bus cabin, see Findings of Fact, supra ¶ 38, at 8 (citing December 20 Tr. at 22:3-6 (Cordova, Perry); April 29 Tr. at 4:9-10 (Perry)), Jackson initially said he did not have any additional luggage in the bus cabin, see Findings of Fact, supra ¶ 39, at 9 (citing April 29 Tr. at 4:9-11 (Jackson, Perry)).  After Jackson revealed the white Dolce & Gabbana shopping bag's contents through a self-search, see Findings of Fact, supra ¶ 42, at 9 (citing December 20 Tr. at 22:20-24 (Cordova, Perry); id. at 23:9-10 (Perry); id. at 23:15-16 (Perry); id. at 86:24-87:7 (Meyers, Perry); id. at 88:11-19 (Meyers, Perry)), and denied consent for Perry to search the bag himself, see Findings of Fact, supra ¶ 48, at 10 (citing April 29 Tr. at 4:22-23 (Jackson)); Findings of Fact, supra ¶ 48, at 10 (citing December 20 Tr. at 23:25-24:2 (Perry); id. at 70:1-2 (Perry); id. at 74:14-17 (Meyers, Perry)), Perry asked Jackson if the black duffle bag under the white Dolce & Gabbana bag belonged to Jackson, see Findings of Fact, supra ¶ 50, at 10 (citing April 29 Tr. at 5:1-3 (Perry)).  Only after Perry pointed out the black duffle bag did Jackson identify it as his own.  See Findings of Fact, supra ¶ 51, at 10 (citing December 20 Tr. at 22:7-10 (Cordova, Perry); id. at 24:18-24 (Cordova, Perry); id. at 25:19-24 (Cordova, Perry); April 29 Tr. at 5:4-9 (Jackson, Perry)).

In light of these facts, Jackson's behavior can be characterized as evasive; he was not forthcoming in identifying all of the bags he had with him, both through a misleading omission and an outright lie.  As Perry testified, in his experience as a DEA agent, it is common for passengers who have illegal narcotics in a bag to attempt to distance themselves from that bag by not claiming it as their luggage.  See Findings of Fact, supra ¶ 52, at 10 (citing December 20 Tr. at 25:21-26:5 (Cordova, Perry)).  In Johnson, the Tenth Circuit concluded (i) that the Court did not err in finding that the defendant lied to Perry during an interdiction operation when the defendant said he did not have any luggage, and (ii) that the Court was right to consider the defendant's lie

in its probable-cause analysis.  See 43 F.4th at 1108 (citing United States v. Moore, 22 F.3d 241, 243-44, 244 n.4 (10th Cir. 1994)).  As noted in United States v. Moore, "lying to an officer is *not* consistent with innocent travel."  22 F.3d at 244 n.4 (emphasis in original).  Here, Jackson lied to Perry when he said he did not have any luggage beyond the white Dolce & Gabbana bag in the bus cabin.  See Findings of Fact, supra ¶ 39, at 9 (citing April 29 Tr. at 4:9-11 (Jackson, Perry)). In addition, earlier in the interaction, when Perry first asked Jackson whether he was traveling with luggage, Jackson told Perry that he had luggage in the cargo hold and only pointed to the white Dolce & Gabbana shopping bag, but not to the black duffle bag underneath it.  See Findings of Fact, supra ¶ 37, at 8 (citing December 20 Tr. at 20:24-21:9 (Cordova, Perry); April 29 Tr. at 4:1-8 (Jackson, Perry); Blue Duffle Bag Photo).  The Court acknowledges that Jackson's initially not identifying the black duffle bag is more akin to a misleading omission than to his later outright lie, but Jackson's initial misrepresentation has the same effect, because it serves to give Perry a false impression.  Further, the Tenth Circuit has stated, in relation to furtive movements like moving a backpack, that "furtive efforts . . . can factor into the probable-cause analysis."  Johnson, 43 F.4th at 1108 (quoting United States v. McGehee, 672 F.3d 860, 870 (10th Cir, 2012).  The Court considers it appropriate to factor misleading and evasive statements that fall short of outright lies but that are properly characterized as "furtive" into the probable cause analysis, as well.  If "lying to an officer is *not* consistent with innocent travel," United States v. Moore, 22 F.3d at 244 n.4 (emphasis in United States v. Moore), then misleading an officer by omission also is not consistent with innocent travel.  The Court concludes that Jackson's lie, as well as his evasive and misleading statement in response to Perry's questioning about his bags, weigh in favor of a finding of probable cause.

Further, the Court determines that the manner in which Jackson positioned himself in front of Perry while conducting the self-search of the black duffle bag supports probable cause.  When Perry asked Jackson to show Perry the black duffle bag's contents, see Findings of Fact, supra ¶ 53, at 10 (citing December 20 Tr. at 26:9-12 (Cordova, Perry); id. at 88:20-89:1 (Meyers, Perry); April 29 Tr. at 5:10-11 (Perry)), Jackson handed Perry a partially-eaten strawberry before lifting his black duffle bag from the floor, arising from his seat, and placing the black duffle bag on the empty window seat next to him, see Findings of Fact, supra ¶ 54, at 11 (citing December 20 Tr. at 26:13-18 (Cordova, Perry); id. at 72:10-16 (Meyers, Perry); id. at 89:5-10 (Perry); id. at 107:12-18 (Cordova, Perry); April 29 Tr. at 5:13-16 (Perry)).  Perry told Jackson, "Thank you, sir.  Don't smash your strawberries, here.  I'm going to put this back in the -- put that back in there for you. I didn't want to hold that.  Thank you, sir," Findings of Fact, supra ¶ 55, at 11 (quoting April 29 Tr. at 5:13-17 (Perry)), and placed the partially-eaten strawberry into a plastic container of strawberries partially underneath Jackson's black duffle bag, see Findings of Fact, supra ¶ 56, at 11 (citing December 20 Tr. at 72:17-21 (Meyers, Perry); id. at 90:11-19 (Meyers, Perry); id. at 91:16-23 (Meyers, Perry); April 29 Tr. at 5:13-17 (Perry)).  When Jackson placed the black duffle bag on the empty window seat, he stood in front of the aisle seat, facing the window, in part blocking Perry's view.  See Findings of Fact, supra ¶ 57, at 11 (citing December 20 Tr. at 26:19-25 (Cordova, Perry); id. at 90:20-23 (Meyers, Perry); id. at 91:11-15 (Meyers, Perry); id. at 107:18-20 (Perry)).  When Jackson placed the black duffle bag on the empty window seat, Perry stood just behind his seat, in the bus' aisle, with one foot partially behind his seat and the other foot partially in the aisle.  See Findings of Fact, supra ¶ 58, at 11 (citing December 20 Tr. at 91:7-10 (Perry)). When Jackson placed the black duffle bag on the empty window seat, Perry stood just behind his seat, in the bus' aisle, with one foot partially behind his seat and the other foot partially in the aisle.

See Findings of Fact, supra ¶ 58, at 11 (citing December 20 Tr. at 91:7-10 (Perry)).  Jackson opened

the bag and began to move quickly the items inside the bag.  See Findings of Fact, supra ¶ 59, at

11 (citing December 20 Tr. at 89:5-10 (Perry); id. at 107:23-25 (Perry)).

      The Court concludes that the actions which Jackson took in anticipation of and during the

self-search of the black duffle bag were "furtive efforts" that "can factor into the probable-cause

analysis."  Johnson, 43 F.4th at 1108 (quoting United States v. McGehee, 672 F.3d at 870).  The

most relevant fact in this interaction is that, when Jackson placed the black duffle bag on the empty

window seat, he stood in front of the aisle seat, facing the window, in part blocking Perry's view.

See Findings of Fact, supra ¶ 57, at 11 (citing December 20 Tr. at 26:19-25 (Cordova, Perry); id.

at 90:20-23 (Meyers, Perry); id. at 91:11-15 (Meyers, Perry); id. at 107:18-20 (Perry)).  As the

Tenth Circuit concluded in Johnson, when the defendant in that case "attempted to block Perry's

view of the bag's contents" when the defendant revealed them to Perry, the defendant's "furtive

actions added to Perry's interpretation of [the defendant's] self-search as suspicious, further

contributing to probable cause."  Johnson, 43 F.4th at 1109 (citing United States v. McGehee, 672

F.3d at 870.  The Court characterizes Jackson's conduct as "furtive," by virtue of his placing the

bag on the empty window seat and partially blocking Perry's view of it, see Findings of Fact, supra

¶ 57, at 11 (citing December 20 Tr. at 26:19-25 (Cordova, Perry); id. at 90:20-23 (Meyers, Perry);

id. at 91:11-15 (Meyers, Perry); id. at 107:18-20 (Perry)), before moving quickly the items inside

the bag, see Findings of Fact, supra ¶ 59, at 11 (citing December 20 Tr. at 89:5-10 (Perry); id. at

107:23-25 (Perry)).  Accordingly, the Court concludes that the evasive and harried manner in

which Jackson revealed the black duffle bag's contents weighs in favor of a finding of probable

cause.

Finally, the Court examines the key moment in the Jackson-Perry encounter on the bus: Jackson's revealing his black duffle bag's contents to Perry.  It is worth noting that, at the time Jackson revealed his black duffle bag's contents, Perry already had: (i) learned that Jackson was traveling under another name to and from destinations that were not his home; (ii) realized that Jackson lied about and did not identify each of the bags with which he was traveling; and (iii) seen Jackson partially blocking his view of the black duffle bag as he rummaged quickly through it. The Court analyzes both what Jackson showed Perry, as well as what he told him, when he opened the black duffle bag.

The Court determines that Jackson's statements before opening his black duffle bag, in conjunction with what Perry saw in the black duffle bag, support a finding of probable cause.  As Jackson manipulated the black duffle bag's contents, he told Perry: "It's just got clothes in here." Findings of Fact, supra ¶ 60, at 11 (quoting April 29 Tr. at 5:18 (Jackson)).  In response, Perry asked Jackson: "[W]hat's inside of the clothes?"  Findings of Fact, supra ¶ 61, at 11 (quoting April 29 Tr. at 5:22-23 (Perry)).  See Findings of Fact, supra ¶ 61, at 11 (citing December 20 Tr. at 28:23-24 (Cordova, Perry); id. at 102:4-9 (Meyers, Perry)).  Jackson in turn responded: "Nothing." Findings of Fact, supra ¶ 62, at 12 (quoting April 29 Tr. at 5:24 (Jackson)).  See Findings of Fact, supra ¶ 62, at 12 (citing December 20 Tr. at 28:25-29:3 (Cordova, Perry); id. at 102:8-11 (Meyers, Perry)).  What Perry saw, however, suggested that Jackson had lied again, another factor weighing in favor of probable cause.  See United States v. Moore, 22 F.3d at 244 n.4 ("[L]ying to an officer is *not* consistent with innocent travel.").  Perry saw bulges inside the clothing in Jackson's bag. See Findings of Fact, supra ¶ 63, at 12 (citing December 20 Tr. at 27:16-20 (Cordova, Perry); id. at 92:6-20 (Meyers, Perry); id. at 107:25-108:1 (Perry)).  Perry also saw thin, clear plastic inside the clothing in Jackson's bag, see Findings of Fact, supra ¶ 64, at 12 (citing December 20 Tr. at

27:21-24 (Cordova, Perry); id. at 92:24-93:4 (Meyers, Perry); id. at 107:25-108:1 (Perry)), which he thought was vacuum-sealed or heat-sealed, see Findings of Fact, supra ¶ 65, at 12 (citing December 20 Tr. at 27:21-24 (Perry); id. at 29:9-15 (Cordova, Perry); id. at 37:1-5 (Cordova, Perry)).  Perry testifies that, in his experience as a DEA agent, he had seen heat-sealed or vacuum-sealed plastic during interdiction operations on hundreds of occasions and, every time, it contained illegal narcotics or proceeds from the sale of illegal narcotics, see Findings of Fact, supra ¶ 66, at 12 (citing December 20 Tr. at 29:16-30:2 (Cordova, Perry)), and, accordingly, he thought that there were bundles of narcotics inside the plastic inside Jackson's bulging clothing in the black duffle bag,  see Findings of Fact, supra ¶ 67, at 12 (citing December 20 Tr. at 30:3-8 (Cordova, Perry); id. at 103:7-19 (Meyers, Perry); id. at 108:2-18 (Cordova, Perry)).  Accordingly, not only did Jackson lie to Perry about the bag containing only clothes, see Findings of Fact, supra ¶ 62, at 12 (quoting April 29 Tr. at 5:24 (Jackson); citing December 20 Tr. at 28:25-29:3 (Cordova, Perry); id. at 102:8-11 (Meyers, Perry)), but the bag's contents, i.e., the bundles and thin, clear plastic, were, in Perry's extensive experience, highly suggestive of the presence of illegal narcotics or the proceeds from their sale, see Findings of Fact, supra ¶ 66, at 12 (citing December 20 Tr. at 29:16-30:2 (Cordova, Perry)).

In previous cases involving Perry, courts have concluded that Perry's seeing items in a defendant's bag that are indicative of the presence of illegal narcotics in his experience, contributes to the existence of probable cause to arrest a defendant.  See, e.g., Johnson, 43 F.4th at 1109; United States v. Vazquez-Lopez, 437 F. Supp. 3d 1041, 1051 (D.N.M. 2020)(Herrera, J.).  In Johnson, the Tenth Circuit upheld the Court's conclusion that there was probable cause for Perry to arrest a defendant, in part on the basis of Perry's testimony,  "based on his years of experience, that he in fact saw 'an oblong-shaped bundle' wrapped in clothing and protruding" from the

defendant's backpack, and that "drug traffickers often hide bundles of illegal narcotics inside articles of clothing and that [the] bundle, based in part on its shape and size, could contain contraband," testimony which is consistent with Perry's in this case.  Johnson, 43 F.4th at 1109. While the Tenth Circuit reversed the Court in Johnson on the question of whether it was a foregone conclusion that the bag contained illegal narcotics, the Tenth Circuit affirmed the Court on the question of probable cause to arrest.  See Johnson, 43 F.4th at 1109.  Accordingly, the probable cause analysis in Johnson, which turns on similar facts to this case, supports a finding of probable cause here.  Similarly, in United States v. Vazquez-Lopez, Judge Herrera concluded that Perry's discovery of "bundles that appeared to be illegal narcotics . . . wrapped in women's clothing" contributed to probable cause.[15]  See 437 F. Supp. 3d at 1051.  The Court concludes that, as in

---

[15]It bears reciting Judge Herrera's summary of the factors weighing in favor of probable cause in United States v. Vazquez-Lopez to illuminate the similarity of the facts in that case to the present one.  Evasive behavior, untruthful and unforthcoming answers, and the discovery of items that are indicative of illegal narcotics' presence are present in both cases:

> The Court concludes that Perry did have probable cause to believe that Defendant committed a crime.  First, the evidence at the hearing showed that Defendant was seated with the blue bag in a manner that suggested possession -- not only with the bag directly beneath her feet, but also with one or both of her feet actually touching it.  Further, Defendant had placed her brown bag on top of the blue bag.  Defendant's actions would suggest to any objective observer that Defendant owned the blue bag because people do not typically behave in such a manner toward luggage that does not belong to them.  Second, Defendant said that the blue bag was already on the bus when she boarded it, but she could not say which city she was in when she first saw it.  Third, the blue bag contained bundles that appeared to be illegal narcotics.  Fourth, those bundles were wrapped in women's clothing that was not too dissimilar from the clothing found in Defendant's brown bag.  Fifth, during their consensual encounter, Defendant gave Perry evasive, inconsistent, and unclear answers to questions about her ultimate destination.  At first she said that she was going to Oklahoma City, and then at the end of the investigative detention she said her destination was Little Rock.  Sixth, Defendant gave vague, inconsistent and confusing answers about who she was visiting, who was picking her up, which family member was sick, and what their illness was.  Perry attempted to confirm Defendant's story with the phone number she provided

Johnson and United States v. Vazquez-Lopez, Perry's catching sight of suspicious items in Jackson's bag -- here, bundles and thin, clear plastic -- contributes to probable cause.

Having examined the totality of the circumstances of the Jackson-Perry interaction on the bus, the Court concludes that Perry had probable cause to arrest Jackson, because there was a "substantial probability that a crime ha[d] been committed" and that Jackson had committed the crime. St. John v. Justmann, 771 F.2d 445, 448 (10th Cir. 1985). In summary, the following factors created probable cause for Perry to arrest Jackson: (i) Perry's discovery that Jackson was traveling under another name to and from a place that he did not live; (ii) Jackson's not identifying all of the luggage with which he was traveling, both by falsehood and omission; (iii) Jackson's engaging in furtive efforts, both physical and verbal, while conducting the self-search of his black duffle bag; and (iv) Perry's discovery of bundles and thin, clear plastic in the clothing in Jackson's black duffle bag, which, in Perry's experience is indicative of the presence of illegal narcotics or the proceeds therefrom. The Court's analysis proceeds on the conclusion that it was not improper for Perry to arrest Jackson.

## IV.  PERRY'S SEIZURE OF JACKSON'S BAGS WAS PERMISSIBLE, BECAUSE IT WAS BASED ON PROBABLE CAUSE.

Next, having concluded that Perry's arrest of Jackson was supported by probable cause and therefore lawful, the Court determines that Perry lawfully seized Jackson's bags. The Tenth Circuit states in United States v. Corral, 970 F.2d 719 (10th Cir. 1992):

> It is a well established legal principle that "under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New*

---

but was unable to do so. Finally, Perry credibly testified that Defendant acted in a nervous manner.

United States v. Vazquez-Lopez, 437 F. Supp. 3d at 1051.

*Hampshire*, 403 U.S. 443 . . . .  A plain view seizure of incriminating evidence is sustainable if (1) the item is indeed in plain view; (2) the police officer is lawfully located in a place from which the item can be plainly seen; (3) the officer has a lawful right of access to the item itself; and (4) it is immediately apparent that the seized item is incriminating on its face.  *See Horton v. California*, 496 U.S. 128, [136-37 (1990)].

970 F.2d at 723.  For an object's incriminating character to be immediately apparent, there must be "probable cause to believe it [is] contraband or evidence of a crime."  Johnson, 43 F.4th at 1110 (quoting United States v. Angelos, 433 F.3d at 747).

Given the Court's conclusion that Perry had probable cause to arrest Jackson, in part because Perry discovered bundles and clear plastic in Jackson's clothing during the self-search of the black duffle bag, it follows that it was proper for Perry to make a plain-view seizure of the "incriminating" items, i.e., Jackson's bags on the Greyhound bus.  United States v. Corral, 970 F.2d at 723 (citing Horton v. California, 496 at 136-37).  Jackson's bags were in plain view: the white Dolce & Gabbana shopping bag and black duffle bag were next to Jackson during the encounter with Perry, see Findings of Fact, supra ¶ 35, at 8 (citing December 20 Tr. at 80:7-25 (Meyers, Perry); id. at 84:8-19 (Meyers, Perry); id. at 85:5-10 (Meyers, Perry); Shopping Bag Photo; Black Duffle Bag Photo), and his blue rolling duffle bag was in the cargo hold, see Findings of Fact, supra ¶ 77, at 13 (citing December 20 Tr. at 31:4-12 (Cordova, Perry)).  Perry and Zamarron were lawfully on the bus and had a lawful right to access Jackson's bags.[16]  See United States v. Corral, 970 F.2d at 723 (citing Horton v. California, 496 at 136-37).  Finally, given that

---

[16]While Perry and Zamarron had a lawful right to access, i.e., to carry off the bus, Jackson's bags, the lawfulness of the subsequent search of Jackson's bags is another matter, which the Court examines later in this Memorandum Opinion and Order.  See infra at 103-15.  As the Tenth Circuit notes in Johnson, "although the plain-view exception 'may support the warrantless *seizure* of a container believed to contain contraband,' it does not automatically support a 'subsequent *search* of the concealed contents of the container.'"  43 F.4th at 1110 (quoting United States v. Corral, 970 F.2d at 725).

Perry had probable cause to arrest Jackson, as there was a "substantial probability that a crime ha[d] been committed," St. John v. Justmann, 771 F.2d at 448 -- specifically, that Jackson was trafficking illegal narcotics in his bags -- it follows that it was "immediately apparent" that Jackson's luggage was "incriminating on its face," United States v. Corral, 970 F.2d at 723 (citing Horton v. California, 496 at 136-37).   Accordingly, the Court concludes that, just as Perry's arresting Jackson without a warrant was justified, so too was his seizing Jackson's bags.

**V.   ALTHOUGH PERRY'S POST-ARREST SEARCH OF JACKSON'S BAGS WAS IMPERMISSIBLE UNDER THE PLAIN-VIEW DOCTRINE, BECAUSE IT WAS NOT A FOREGONE CONCLUSION THAT THEY CONTAINED ILLEGAL NARCOTICS, THE SEARCH WAS PERMISSIBLE AS AN INVENTORY SEARCH.**

Finally, the Court concludes that the post-arrest search of Jackson's bags was proper. Jackson characterizes his bags' post-arrest search, which occurred at the Albuquerque DEA office, see Findings of Fact, supra ¶ 81, at 14 (citing December 20 Tr. at 32:6-17 (Cordova, Perry); id. at 105:13-106:1 (Meyers, Perry); Shopping Bag Photo; Black Duffle Bag Photo; Blue Duffle Bag Photo), as impermissible under the Fourth Amendment, see Supplemental Suppression Motion at 22-4.   By contrast, Perry makes two arguments to support the legality of the post-arrest search: (i) that the search was permissible as an inventory search; and (ii) that the search was permissible under the plain-view doctrine.   For the reasons discussed below, Perry's first argument is persuasive, but Perry's second argument is not persuasive.   Because the post-arrest search at the DEA office that yielded the illegal narcotics evidence was permissible as an inventory search, the Court declines to suppress the evidence.

A.    **BECAUSE IT WAS NOT A FOREGONE CONCLUSION THAT THE
BLACK DUFFLE BAG CONTAINED ILLEGAL NARCOTICS, THE
POST-ARREST SEARCH OF JACKSON'S BAGS WAS NOT
PERMISSIBLE UNDER THE PLAIN-VIEW DOCTRINE.**

While Perry proceeds on the primary argument that the post-arrest search was permissible

as an inventory search, the Court first addresses the alternative contention that the search was

permissible under the plain-view doctrine, an issue that has appeared in past cases involving Perry.

See Johnson, 43 F.4th at 1110-15.  In determining whether the plain-view exception to the warrant

requirement justifies the post-arrest search, the Court takes guidance from Johnson, which,

speaking to the plain-view exception's applicability, elaborates:

> One exception to the warrant requirement is the plain-view exception,
> which allows a law-enforcement officer to seize evidence of a crime without a
> warrant under a limited set of circumstances.  *See United States v. Angelos*, 433
> F.3d 738, 747 (10th Cir. 2006).  It applies if "(1) the officer was lawfully in a
> position from which the object seized was in plain view, (2) the object's
> incriminating character was immediately apparent . . . and (3) the officer had a
> lawful right of access to the object." *Id.* (quoting *United States v. Thomas*, 372 F.3d
> 1173, 1178 (10th Cir. 2004)).  For an object's incriminating character to be
> immediately apparent, there must be "probable cause to believe it [is] contraband
> or evidence of a crime." *Id.*  But although the plain-view exception "may support
> the warrantless *seizure* of a container believed to contain contraband," it does not
> automatically support a "subsequent *search* of the concealed contents of the
> container."  *United States v. Corral*, 970 F.2d . . . [at] 725 . . . .  Rather, a
> subsequent search is only valid if "the contents of a seized container are a foregone
> conclusion" (or if the search is "accompanied by a warrant or justified by one of
> the exceptions to the warrant requirement").  *Id.*

Johnson, 43 F.4th at 1110.  Having concluded that Perry had probable cause to seize Jackson's

bags, and given that Perry and the other DEA agents never obtained a warrant to search Jackson's

bags, the Court's inquiry now is whether it was a "foregone conclusion" that Jackson's bags

contained illegal narcotics.  Johnson, 43 F.4th at 1110 (quoting United States v. Corral, 970 F.2d

at 725).

In determining whether it was a foregone conclusion that Jackson's bags contained illegal narcotics, the Court examines what Perry saw when Jackson conducted his self-searches of his bags on the bus. Although Perry later discovered that the white Dolce & Gabbana shopping bag contained 1.10 gross kilograms of heroin in a clear plastic, heat-sealed bundle, see Findings of Fact, supra ¶ 84, at 15 (citing December 20 Tr. at 32:18-33:8 (Cordova, Perry)), Perry discovered no such evidence when Jackson conducted his self-search of the white Dolce & Gabbana shopping bag on the bus before denying Perry consent to search the bag, see Findings of Fact, supra ¶ 48, at 10 (quoting April 29 Tr. at 4:22-23 (Jackson)). See Findings of Fact, supra ¶ 48, at 10 (citing December 20 Tr. at 23:25-24:2 (Perry); id. at 70:1-2 (Perry); id. at 74:14-17 (Meyers, Perry)). Accordingly, the Court concludes that it was not a foregone conclusion that the white Dolce & Gabbana shopping bag contained illegal narcotics. Similarly, there is no evidence that anybody -- whether Jackson, Perry, or Zamarron -- opened Jackson's blue rolling duffle bag, which was in the cargo hold during Jackson's encounter with Perry, before the post-arrest search at the DEA office. See Findings of Fact, supra ¶ 77, at 13 (citing December 20 Tr. at 31:4-12 (Cordova, Perry)). Accordingly, the Court concludes that it was not a foregone conclusion that the blue rolling duffle bag contained illegal narcotics.

The black duffle bag presents a distinct set of issues. In contrast to Jackson's self-search of the white Dolce & Gabbana shopping bag, Jackson's self-search of the black duffle bag suggested, in Perry's experience, the presence of illegal narcotics, see Findings of Fact, supra ¶ 66, at 12 (citing December 20 Tr. at 29:16-30:2 (Cordova, Perry)), because Perry saw bulges inside the clothing in the bag, see Findings of Fact, supra ¶ 63, at 12 (citing December 20 Tr. at 27:16-20 (Cordova, Perry); id. at 92:6-20 (Meyers, Perry); id. at 107:25-108:1 (Perry)), and thin, clear plastic, see Findings of Fact, supra ¶ 64, at 12 (citing December 20 Tr. at 27:21-24 (Cordova,

Perry); id. at 92:24-93:4 (Meyers, Perry); id. at 107:25-108:1 (Perry)), which Perry thought was vacuum-sealed or heat-sealed, see Findings of Fact, supra ¶ 65, at 12 (citing December 20 Tr. at 27:21-24 (Perry); id. at 29:9-15 (Cordova, Perry); id. at 37:1-5 (Cordova, Perry)).  Accordingly, Perry thought there were bundles of narcotics inside the plastic inside Jackson's bulging clothing in the black duffle bag.  See Findings of Fact, supra ¶ 67, at 12 (citing December 20 Tr. at 30:3-8 (Cordova, Perry); id. at 103:7-19 (Meyers, Perry); id. at 108:2-18 (Cordova, Perry)).  The question is whether what Perry saw, in the context of the Perry-Jackson encounter, made it a "foregone conclusion" that the bag contained illegal narcotics.  United States v. Johnson, 43 F.4th at 1110 (quoting United States v. Corral, 970 F.2d at 725).

The Court concludes that what Perry saw in the black duffle bag -- while incriminating, particularly in light of his evasive and suspicious behavior during the interaction that contributed to the probable cause for his arrest -- does not make it a foregone conclusion that Jackson was in possession of illegal narcotics.  The Tenth Circuit's decision in Johnson guides the Court's reasoning.  See 43 F.4th at 1112-14.  As the Tenth Circuit reasons in that case, "the foregone-conclusion standard is high: It requires 'virtual certainty' that a container holds contraband," which is "'a degree of certainty as to the contents . . . equivalent to the plain view of the [contraband] itself.'"  Johnson, 43 F.4th at 1112 (quoting United States v. Corral, 970 F.2d at 725 (alteration in Johnson, but not in United States v. Corral)).  In Johnson, the Tenth Circuit reversed the Court's conclusion that the plain-view exception to the warrant requirement applied when it concluded that it was not a foregone conclusion that the defendant's bag contained illegal narcotics.  See 43 F.4th at 1114.  In that case, during a defendant's self-search of his bag, Perry "observed a black 'oblong-shaped large bundle' 'protruding' from some clothing," and after arresting the defendant, "reached inside the open backpack and 'felt th[e] bundle,'" which Perry "testified . . . confirmed

- 106 -

his suspicion about the bundle being illegal narcotics, explaining that the bundle was 'very hard' and 'a pretty large bundle,'" which was "oblong shaped" and "had a 'crinkling or kind of crushing feel.'"[17]  Johnson, 43 F.4th at 1105-06.

If it was not a foregone conclusion that the defendant's bag in Johnson contained illegal narcotics, it is not a foregone conclusion that Jackson's bags contained illegal narcotics in this case.  The facts leading up to the self-search in Johnson, and which the Tenth Circuit affirmed contributed to probable cause to arrest the defendant and seize his bags, are similar, but not identical, to those in this case:

> (1) Perry saw [the defendant] place the bag underneath the seat next to him while Perry questioned the other passengers; (2) [the defendant] lacked identification; (3) [the defendant] lied to Perry when he told him that he did not have luggage; (4) [the defendant] conducted a "self-search" of the backpack while attempting to obstruct Perry's view; (5) Perry saw the black bundle's "size and shape," which, based on his experience, led Perry to believe the bundle contained illegal narcotics; (6) when Perry asked about the black bundle, Johnson, who had answered Perry's earlier questions, did not respond.

Johnson, 43 F. 4th at 1107.  As in this case, the pre-arrest facts in Johnson include: (i) evasive action, i.e., moving the bag when Perry questioned other passengers and conducting a self-search while attempting to obstruct Perry's view; (ii) false statements and omissions, i.e., the defendant lying to Perry about his luggage and not answering Perry's questions about his bag's contents; (iii) identification abnormalities, i.e., the defendant not having identification; and (iv) the discovery of suspicious material as a result of the defendant's self-search, i.e., the black bundle.

---

[17]Unlike in this case, in Johnson, soon after the defendant's self-search and arrest, Perry reached inside the defendant's bag and felt its contents, which the Tenth Circuit concluded constituted a warrantless search.  See Johnson, 43 F.4th at 1112.  No such "'probing tactile examination' . . . done in an 'exploratory manner,'" Johnson, 43 F.4th at 1112 (quoting Bond v. United States, 529 U.S. 334, 337-39 (2000)), occurred in this case before the search at the Albuquerque DEA office, see Findings of Fact, supra ¶ 81, at 14 (citing December 20 Tr. at 32:6-17 (Cordova, Perry); id. at 105:13-106:1 (Meyers, Perry)).

See Johnson, 43 F. 4th at 1107.  Johnson's facts, however, depart after the defendant's arrest and provide further support for Perry's foregone-conclusion analysis than exists here.  In Johnson, there was a post-arrest warrantless search on the bus,[18] during which Perry touched the bundle in the bag and got a better sense of its physical qualities, i.e., that it was oblong, large, hard, and had a "'crinkling or kind of crushing feel.'"  Johnson, 43 F.4th at 1105-06.  Accordingly, in Johnson, in addition to the pre-arrest facts, which were broadly similar in their probative value as to whether the defendant's luggage contained illegal narcotics, there were additional facts, gained by a "'probing tactile examination,'" which the Tenth Circuit concluded was an unlawful warrantless search, because it was not a foregone conclusion that the defendant's bags contained narcotics.  43 F.4th at 1112 (quoting United States v. Bond, 529 U.S. at 337-39), 1114.

This time, unlike in Johnson, Perry rightly stopped short of conducting a warrantless search of Jackson's bags' contents on the bus.  See Johnson, 43 F.4th at 1112 (holding that Perry's reaching inside the defendant's bag to feel the bundle "exceeded the 'minimal intrusion that is permitted in a plain[-]view seizure.'" (quoting United States v. Miller, 769 F.2d 554, 557 (9th Cir. 1985), and citing United States v. Most, 876 F.2d at 198 n.13 (alteration in Johnson, but not United States v. Miller)).  As a result, only sight, and not touch, aided Perry's assessment of the bag's contents.  During Jackson's self-search of the black duffle bag, Perry saw bulges inside the clothing it contained, see Findings of Fact, supra ¶ 63, at 12 (citing December 20 Tr. at 27:16-20 (Cordova, Perry); id. at 92:6-20 (Meyers, Perry); id. at 107:25-108:1 (Perry)), and thin, clear plastic, see

---

[18]In this case, a post-arrest search occurred, as well, but only at the Albuquerque DEA office, after Perry took Jackson into custody.  As discussed later in the Court's analysis, the method and context of the post-arrest search in this case differs from that in Johnson in a way that carries implications for which exception to the warrant requirement applies and whether evidence suppression is appropriate.  See infra at 109-15.

Findings of Fact, supra ¶ 64, at 12 (citing December 20 Tr. at 27:21-24 (Cordova, Perry); id. at 92:24-93:4 (Meyers, Perry); id. at 107:25-108:1 (Perry)), which he thought was vacuum-sealed or heat-sealed, see Findings of Fact, supra ¶ 65, at 12 (citing December 20 Tr. at 27:21-24 (Perry); id. at 29:9-15 (Cordova, Perry); id. at 37:1-5 (Cordova, Perry)).  There was no physical contact with the suspicious material of the kind that Perry alleged "'definitely confirmed' his earlier suspicion that the bundled contained illegal narcotics" in Johnson.  43 F.4th at 1112.  Relying on what Jackson said and did before the self-search, and what Perry saw during the self-search, the Court cannot conclude soundly that it was a "'virtual certainty'" that Jackson's bag contained contraband, as showing a foregone conclusion requires.  Johnson, 43 F.4th at 1112 (quoting United States v. Corral, 970 F.2d at 725.  After all, a foregone conclusion requires "a degree of certainty as to the contents . . . equivalent to the plain view of the [contraband] itself."  Johnson, 43 F.4th at 1112 (quoting United States v. Corral, 970 F.2d at 725 (alteration in Johnson, but not United States v. Corral)).  Jackson's suspicious behavior, paired with Perry's seeing bulges and thin, clear plastic in Jackson's bag, falls short of this requirement.  If the Tenth Circuit did not accept Perry's foregone-conclusion arguments in Johnson, a case with more indicia of contraband's presence than this one, the Court cannot conclude soundly that it was a foregone conclusion that Jackson's bag contained illegal narcotics.  Accordingly, the Court concludes that the plain-view exception to the warrant requirement does not apply to the post-arrest search of Jackson's bags.

**B.     THE POST-ARREST SEARCH OF JACKSONS' BAGS WAS PERMISSIBLE AS AN INVENTORY SEARCH, BECAUSE IT WAS A REASONABLE SEARCH UNDERTAKEN IN ACCORDANCE WITH AN INVENTORY SEARCH POLICY THAT SERVES A VALID GOVERNMENTAL INTEREST, AND THERE IS NO EVIDENCE OF BAD FAITH.**

As the last step in its Fourth Amendment analysis, the Court concludes that Perry's post-

arrest search of Jackson's bags was permissible as an inventory search.  See Illinois v. Lafayette, 462 U.S. at 643 (stating that an inventory search, in which the police "search the personal effects of a person under lawful arrest as a part of the routine administrative procedure at a police stationhouse incident to booking and jailing the suspect . . . . [,] constitutes a well-defined exception to the warrant requirement").  For an inventory search to be permissible, it must be undertaken "in accordance with established inventory procedures."  Illinois v. Lafayette, 462 U.S. at 648.  Inventory searches conducted pursuant to department policy are unconstitutional if the officers acted out of bad faith, for the sole purpose of investigation.  See Colorado v. Bertine, 479 U.S. at 371; United States v. Sanchez, 720 F. App'x at 970; United States v. Moraga, 76 F. App'x at 228.  The burden is on the United States to demonstrate that an inventory search is reasonable.  See United States v. O'Neil, 62 F.4th at 1292.  In weighing whether an inventory search is reasonable, courts must "'balanc[e] its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"  Illinois v. Lafayette, 462 U.S. at 644 (quoting Delaware v. Prouse, 440 U.S. at 654 (alteration in Illinois v. Lafayette, but not in Delaware v. Prouse)).

Before determining whether the post-arrest search of Jackson's bags was permissible as an inventory search, the Court examines the DEA's inventory-search policy in place at the time of the post-arrest search of Jackson's bags.  Although a written inventory-search policy is not required for an inventory search to be valid, see United States v. O'Neil, 62 F.4th at 1292; United States v. Jacquez, 409 F. Supp. 2d at 1298, the DEA had one in place on April 29, 2022, when the post-arrest search occurred, see December 20 Tr. at 37:14-39:9 (Court, Cordova, Meyers, Perry);

Inventory Search Policy at 1.[19]  Accordingly, the Court looks to the Inventory Search Policy's

terms, which state:

> A complete inventory shall be made of all property that is taken into custody
> by DEA for safekeeping, regardless of whether probable cause exists to search the
> property.  Inventory searches are made to identify items of value in order to protect
> DEA personnel from claims of theft or loss of property that enters DEA Custody.
> Inventory searches need not be made contemporaneous with the arrest of any
> person or at the time of seizure, but must be made as soon as practical after the
> property to be searched has been transported to a DEA or other law enforcement
> facility.  Inventory searches shall be made of all containers, whether locked or
> unlocked, that are lawfully seized for safekeeping.  All items shall be inventoried
> on a DEA-12, Receipt for Cash or Other Items, and the details of the inventory shall
> be reported in the DEA-6 that reports the related enforcement agency.

Inventory Search Policy at 1.  The Inventory Search Policy describes the "safekeeping" purpose

of a DEA inventory search, i.e., "to identify items of value in order to protect DEA personnel from

claims of theft or loss of property that enters DEA Custody."  Inventory Search Policy at 1.  As

the Supreme Court notes in Illinois v. Lafayette, this justification is among the "range of

governmental interests" that supports an inventory search:

> At the stationhouse, it is entirely proper for police to remove and list or
> inventory property found on the person or in the possession of an arrested person
> who is to be jailed . . . .  It is not unheard of for persons employed in police activities
> to steal property taken from arrested persons; similarly, arrested persons have been
> known to make false claims regarding what was taken from their possession at the
> stationhouse.  A standardized procedure for making a list or inventory as soon as
> reasonable after reaching the stationhouse not only deters false claims but also
> inhibits theft or careless handling or articles taken from the arrested person.

---

[19]In addition, Perry testifies that, in his capacity as a special DEA agent, he conducts inventory searches of all items he takes into custody after an arrest, regardless whether he believes the bags contain narcotics.  See Findings of Fact, supra ¶ 80, at 14 (citing December 20 Tr. at 38:10-20 (Cordova, Perry); id. at 104:2-105:12 (Meyers, Perry)).  Although the Tenth Circuit maintains that, for the government, it is the "better practice . . . to introduce . . . written inventory procedures, if they are available," it also accepts officer testimony as proof an inventory search policy's existence.  United States v. O'Neil, 62 F.4th at 1293 n.16.  Here, both the written Inventory Search Policy and officer testimony about it are in evidence.  See Inventory Search Policy; Findings of Fact, supra ¶ 80, at 14 (citing December 20 Tr. at 38:10-20 (Cordova, Perry); id. at 104:2-105:12 (Meyers, Perry)).

462 U.S. at 646.  Accord United States v. O'Neil, 62 F.4th at 1292 ("Inventory searches . . . serve three administrative purposes: 'the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property.  And the protection of the police from potential danger.'' (quoting United States v. Tueller, 349 F.3d at 1243 (quoting South Dakota v. Opperman, 428 U.S. at 369))).  Because the Court concludes that the Inventory Search Policy's stated purposes of "safekeeping" and "identify[ing] items of value in order to protect personnel from claims of theft or loss of property that enters DEA custody," Inventory Search Policy at 1, serve a valid government interest in line with the "administrative purposes" described in United States v. O'Neil, it concludes that it is a "reasonable police . . . inventory procedure[]," 62 F.4th at 1292, and turns its inquiry to the means by which the DEA conducted the post-arrest search.

The Court concludes that the DEA conducted the post-arrest search of Jackson's bags in accordance with the Inventory Search Policy.  See Illinois v. Lafayette, 462 U.S. at 648.  "An inventory search is unconstitutional unless conducted 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" United States v. O'Neil, 62 F.4th at 1292 (quoting Florida v. Wells, 495 U.S. at 4 (quoting Colorado v. Bertine, 479 U.S. at 375), and citing United States v. Haro-Salcedo, 107 F.3d at 772).  The Inventory Search Policy requires that "[a] complete inventory . . . be made of all property that is taken into custody by DEA for safekeeping, regardless of whether probable cause exists to search the property[,] . . . as soon as practical after the property to be searched has been transported to a DEA or other law enforcement facility."  Inventory Search Policy at 1.  At the time of the search, Jackson was under arrest, and his bags were in DEA custody.  See Findings of Fact, supra ¶ 83, at 15 (citing December

20 Tr. at 105:23-106:4 (Meyers, Perry)).  The Inventory Search Policy dictates that "[i]nventory searches shall be made of all containers, whether locked or unlocked, that are lawfully seized for safekeeping," and that "[a]ll items shall be inventoried on a DEA-12, Receipt for Cash or Other Items, and the details of the inventory shall be reported in the DEA-6 that reports the related enforcement agency."  Inventory Search Policy at 1.  DEA agents, including Perry, searched all three of Jackson's bags in a processing room at the Albuquerque DEA office.  See Findings of Fact, supra ¶ 81, at 14 (citing December 20 Tr. at 32:6-17 (Cordova, Perry); id. at 105:13-106:1 (Meyers, Perry); Shopping Bag Photo; Black Duffle Bag Photo; Blue Duffle Bag Photo).  Perry made a record of the non-narcotic items found on a DEA-12 form, see Findings of Fact, supra ¶ 93, at 16 (citing December 20 Tr. at 34:20-35:1 (Cordova, Perry); id. at 42:10-43:22 (Cordova, Perry)); DEA-12, at 1.  A DEA-12 form is a receipt for cash or other items, on which the DEA lists seized personal property, pursuant to the Inventory Search Policy.  See Findings of Fact, supra ¶ 92, at 16 (citing December 20 Tr. at 35:2-4 (Cordova, Perry); id. at 42:10-13 (Cordova, Perry); id. at 44:4-8 (Cordova, Perry)).  Similarly compliant with the Inventory Search Policy, Perry made a record of the narcotics found on a DEA-6 form, see Findings of Fact, supra ¶ 87, at 15 (citing December 20 Tr. at 33:23-34:3 (Cordova, Perry); id. at 33:8-9 (Cordova, Perry); id. at 39:12-21 (Cordova, Perry)); DEA-6 ¶¶ 2-3, at 2, which is an investigation report on which Perry documents an inventory search and any items recovered during an inventory search, see Findings of Fact, supra ¶ 86, at 15 (citing December 20 Tr. at 34:8-9 (Cordova, Perry); id. at 39:22-40:6 (Cordova, Perry)).  Finally, the DEA complied with the Inventory Search Policy requirement that "[a]ll items shall be inventoried on a DEA-12, . . . and the details of the inventory shall be reported in the DEA-6 that reports the related enforcement agency."  Inventory Search Policy at 1.  See DEA-12 at 1; DEA-6 at 3.  The DEA-6 notes that, in accordance with the Inventory Search Policy's stated

"safekeeping" purpose, Inventory Search Policy at 1, the DEA sent the non-narcotic items found in Jackson's bags "to the ADO Non-Drug Evidence Custodian for storage and safekeeping," DEA-6 ¶¶ 3-6, at 3, before ultimately returning the non-narcotic items to Jackson's attorney, see Findings of Fact, supra ¶ 95, at 16 (citing December 20 Tr. at 34:20-23 (Cordova, Perry); id. at 43:11-18 (Cordova, Perry)). In light of the foregoing analysis, the Court is satisfied that the DEA conducted the post-arrest search of Jackson's bags at the DEA office "in accordance with established inventory procedures." Illinois v. Lafayette, 462 U.S. at 648.

Having concluded that the DEA conducted the post-arrest search of Jackson's bags pursuant to department policy, it now examines whether there is evidence that the DEA did not act in good faith or that it conducted the search "for the sole purpose of investigation." United States v. Moraga, 76 F. App'x at 228. The Court finds no such evidence on the record before it. The Inventory Search Policy sets forth steps that must be taken "as soon as practical after the property to be searched has been transported to a DEA or other law enforcement facility." Inventory Search Policy at 1. The DEA seized Jacksons' bags when it arrested him. See Findings of Fact, supra ¶ 77, at 13 (citing December 20 Tr. at 31:4-12 (Cordova, Perry); April 29 Tr. at 6:14-15 (Perry)). With Jackson and his bags in custody, the DEA acted in conformity with its Inventory Search Policy to record the items it seized from Jackson for "safekeeping." Compare Inventory Search Policy at 1 (prescribing inventory search rules for the purpose of safekeeping items in custody), with DEA-12 ¶¶ 2-6, at 2-3 (indicating that the DEA transferred Jackson's items for safekeeping). Perry's testimony that, in his capacity as a special DEA agent, he conducts inventory searches of all items he takes into custody after an arrest, regardless whether he believes the bags contain narcotics, further confirms the post-arrest search's routine nature. See Findings of Fact, supra ¶ 80, at 14 (citing December 20 Tr. at 38:10-20 (Cordova, Perry); id. at 104:2-105:12 (Meyers,

Perry)).  The evidence provides no indicia of an ulterior, investigatory motive underlying the post-arrest search.  Even if there were evidence of a mixed motive, as the Tenth Circuit notes, "'[w]hile mixed motives or suspicions undoubtedly exist in many inventory searches, such motives or suspicions will not invalidate an otherwise proper inventory search.'"  United States v. Sanchez, 720 F. App'x at 970 (quoting United States v. Cecala, 2000 WL 18948, at *2).  Indeed, "[a]n inventory search is invalid only if it is undertaken for the '_sole_ purpose of investigation.'"  United States v. Sanchez, 720 F. App'x at 970 (quoting Colorado v. Bertine, 479 U.S. at 372)(emphasis in United States v. Sanchez, but not in Colorado v. Bertine)).  The United States has met in its burden to demonstrate that the inventory search was reasonable.  See United States v. O'Neil, 62 F.4th at 1292.  The Court concludes that (i) the post-arrest search of Jackson's bags at the DEA office was permissible as an inventory search; and (ii) the Court will not suppress the evidence that the post-arrest search revealed.

　　　**IT IS ORDERED** that: (i) the Defendant's Motion to Suppress Evidence, filed June 22, 2022 (Doc. 20), is denied; and (ii) the Defendant's Supplemental Motion to Suppress Evidence, filed September 8, 2022 (Doc. 38), is denied.

‎ ‎

‎ ‎

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Alexander M.M. Uballez
　United States Attorney
Patrick Cordova
　Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

　　　_Attorneys for the Plaintiff_

Joel R. Meyers
The Law Office of Joel R. Meyers, LLC
Santa Fe, New Mexico

*Attorney for the Defendant*